Middleditch v. Williams.

MARGARET L. MIDDLEDITCH et al., appellants,

*v.*

MARIE C. WILLIAMS and WILLIAM P. WILLIAMS, executors· of the will· of William H. Livingston, deceased, respondents.

1. A will may be contrary to the principles of justice and humanity—it may be both unnatural and unjust—yet if it appears to have been made by a person of sufficient age to be competent to make a will, and also appears to be the free expression of a sound mind, the courts must uphold it.

2. Where want of testamentary capacity or undue influence is alleged, it is the duty of the court to examine the provisions of the will, to see whether or not they furnish any evidence of the truth of the charges made against its· validity. Standing alone they are insufficient to support a judgment against the validity of the will, but in connection with other evidence may be entitled to considerable weight.

3. If a testator possesses sufficient mental power to take into account all the · considerations necessary to the making of a proper will, though he is subject to an insane delusion, yet if it appears that such delusion neither influenced him, nor was calculated to influence him, in making his will, his will must be · upheld.

4. When a person conceives something extravagant to exist, which, however, has no existence, but is the creature of his imagination, and whenever, at the same time, having once so conceived, he is incapable of being permanently reasoned out of such conception, such person, it is safe to say, is subject to an insane delusion.

5. It is only a conception or delusion which springs up spontaneously in the mind of a person, and is not the result of evidence of any kind, that can · be said to furnish evidence that his mind is unsound.

6. Where a person is induced by false evidence or by false statements to believe a fact to exist, which does not· exist, or where, in consequence of his faith in evidence which is true, but which is wholly insufficient to prove the truth of what he believes, he believes a fact to exist which in reality has no existence, his belief may show want of discernment, or that he lacks ordinary power of discrimination, and is, consequently, easily duped, but not that his mind is unsound.

7. Belief in spiritualism, that is, that there can be communication between the spirits of the dead and the living, is not an insane delusion.

Middleditch *v.* Williams.

8. The term "delusion," as applied to insanity, does not mean a mere mistake of fact, or being induced by false evidence to believe that a fact exists which does not exist.

9. The declarations of a testator are competent to show the condition of his mind, but not to prove undue influence by either persons or spirits.

On appeal from a decree of the orphans court of Essex county.

*Mr. Francis E. Marsh,* for the appellants.

*Mr. J. Frank Fort,* for the respondents.

The Vice-Ordinary.

The question presented by the appeal in this case is, whether a decree made by the orphans court of Essex county, on the 4th day of June, 1888, admitting to probate a paper purporting to be the last will of William H. Livingston, deceased, is such a decree as the court should, in view of the facts of the case and the law applicable to them, have made. The paper in question was executed on the 11th day of January, 1887, in the city of New York, where the testator then resided. It appears to have been

Note.—Mere belief in modern spiritualism, so called, is not evidence of mental unsoundness, *La Bau* v. *Vanderbilt, 3 Redf. 384; Matter of Keeler, 12 N. Y. State Rep. 148; Continental Ins. Co.* v. *Delpeuch, 82 Pa. St. 225;* see *Turner* v. *Hand, 3 Wall. Jr. 88. 122; Chafin Will Case, 32 Wis. 557.*

A belief in witchcraft does not render a testator incompetent, *Addington* v. *Wilson, 5 Ind. 137; Schildnecht* v. *Rompf (Ky.), 4 S. W. Rep. 235; Kelly* v. *Miller, 39 Miss. 17; Van Guysling* v. *Van Kuren, 35 N. Y. 70; Matter of Vedder, 6 Dem. 92; Leech* v. *Leech, 1 Phila. 244; Lee* v. *Lee, 4 McCord 183;* see *Johnson* v. *Johnson, 10 Ind. 387; Woodbury* v. *Obear, 7 Gray 467.*

As to the effect of peculiar opinions in regard to a future state of existence, see *Austen* v. *Graham, 1 Spinks 357, 8 Moore P. C. 493; Weir's Will, 9 Dana 434; Bonard's Will, 16 Abb. Pr. (N. S.) 128; Gass* v. *Gass, 3 Humph. 278; Denson* v. *Beazley, 34 Tex. 191.*

Contracts or bequests between a believer in spiritualism and a medium upon whom he relies, whereby the medium obtains a benefit, are presumed to have been obtained through the latter's undue influence, *Connor* v. *Stanley, 72 Cal. 556; Storey's Case, 20 Ill. App. 183; Leighton* v. *Orr, 44 Iowa 679; Greenwood* v. *Cline, 7 Oreg. 17;* see *Norton* v. *Relly, 2 Eden 286; Nottridge* v. *Prince, 2 Giff. 246;* and, it seems, the medium may be indicted for money thus obtained, *Reg.* v. *Giles, 10 Cox C. C. 44.* See, also, *12 Alb. L. J. 216; 40 Id. 384.* —Rep.

executed in strict conformity to the requirements of our statute regulating the execution of wills. After the execution of the paper in question, Mr. Livingston removed to the city of Newark, in this State, where he died on the 4th day of February, 1888. His wife died in August, 1886, and after that date, up to the time of his own death, his family consisted of himself, his daughter Lillian (his only surviving child), and his mother-in-law, Marie C. Williams. His daughter, at the time of her mother's death, was five or six years of age.

The testator, by the paper in question, gives all his property, of every kind and description, to his mother-in-law and, at her death, to her son, William P. Williams, in trust for his daughter, to be held until his daughter has attained the age of twenty-five years, when, in the language of the will,

"Said property shall be handed over intact to her, provided, however, that in consideration of taking care of Lillian till twenty-five years of age, or until her marriage, said Marie C. Williams shall be supported and maintained, in her ordinary manner of living, out of the income derived from said property; and should Marie C. Williams be living when Lillian shall arrive at twenty-five years of age, then Lillian shall give unto Marie C. Williams a satisfactory bond or guarantee for securing to Marie means for her support during the balance of her life. Should my daughter Lillian die before Marie C. Williams then my property shall belong to the latter. And should both Lillian and Marie die before William P. Williams, then my property shall belong to the last named William P. Williams."

Mrs. Williams and William P. Williams are appointed executors. It is not shown who drew this paper, nor where, nor under what circumstances it was drawn. One of the subscribing witnesses says that he thinks the testator wrote it himself. That is the only information we have respecting its preparation or origin.

The validity of this paper as the will of William H. Livingston is contested on two grounds: First, it is said, that it is shown to be the product of an insane mind; and, second, that it is shown to be the result of the exercise of undue influence. And it is claimed that the contents of the paper itself furnish strong evidence of the truth of both these objections. A will

may be contrary to the principles of justice and humanity, its provisions may be shockingly unnatural and extremely unjust, nevertheless, if it appears to have been made by a person of sufficient age to be competent to make a will, and also to be the free and unconstrained product of a sound mind, the courts are bound to uphold it. The courts must so treat papers of this kind, in order to maintain that great principle, which confers upon every citizen of full age and sound mind the right to do with his own as he pleases, so long as he does not attempt to apply his property to an immoral or unlawful purpose. But in cases where want of testamentary capacity or undue influence is alleged, it is the duty of the court to scan the provisions of the will to see whether or not they furnish any evidence of the truth of the charges made against its validity.

The feature of the paper under consideration, which is most likely to attract attention, as tending to show that the disposition which the testator made of his property is both unnatural and unjust, is the fact that he has, either inconsiderately or designedly, manifested an unnatural preference for his mother-in-law and brother-in-law over the issue of his daughter. On scanning the will, it will be observed that it contains no indication whatever that the testator intended, in case his daughter should have issue, but did not survive her grandmother and her uncle, that her issue should take his property; on the contrary, if the will be read according to its plain words, it would seem to be entirely clear, that he intended, if his daughter died in the lifetime of either her grandmother or her uncle, that his property should go, even if his daughter left issue, not to her issue, but first to her grandmother, if she was then living, but if not living, then to her uncle. Such I understand to be the plain direction of the will. It says:

"Should my daughter Lillian die before Marie C. Williams then my property shall belong to the latter. And should both Lillian and Marie die before William P. Williams, then my property shall belong to the last named William P. Williams."

Death is here spoken of generally and without restriction as to time. The testator does not say, if my daughter Lillian

Middleditch v. Williams.

shall die, without leaving lawful issue surviving her, before attaining twenty-five years of age, then my property shall go either to her grandmother or her uncle, but what he says is, if Lillian shall die before her grandmother or before her uncle, then his property shall go to her grandmother, if living, but if not, then to her uncle. Lillian's issue is not mentioned, nor is any provision made for it, either expressly or constructively, though the possibility that she might have issue before attaining twenty-five is a thing which, it would seem, must have been before the testator's mind, for, in making provision for her care, he limits the period that her grandmother shall take care of her to the time when she attains twenty-five, or until her marriage. But, suppose we say, that, according to the settled rule of construction in such cases, the true meaning of the will is, that neither the grandmother nor the uncle will take unless Lillian shall die before attaining twenty-five years of age—and that, I think, is the construction which should be adopted—still, it is apparent, that, under this view, the will is not such an one as a father, having an only child, and in the full possession of his senses, and with the instincts and affections common to our nature, would, when entirely free from any sinister influence, have been likely to make. For, under this view, it will be seen, that if Lillian marries, has issue and dies before attaining twenty-five, her grandmother or her uncle will take the property given by the will, to the exclusion of her issue. The will, in this respect, is, in my judgment, both unnatural and unjust. But this, standing alone, constitutes no reason why the paper should not be given effect as the will of the testator. It may help to show that the testator lacked testamentary capacity, or that his will is not the free expression of his mind and heart, but in a case where it appears that he had the requisite capacity, and that his will is the unfettered expression of his wishes, it amounts to nothing at all.

The paper in question is, however, assailed on other grounds. It is charged that it is the direct product of an insane delusion. The testator was a believer in spiritualism, that is, he believed the spirits of the dead can communicate with the living, through

the agency of persons called mediums, and who possess qualities-
or gifts not possessed by mankind in general.   The proofs show
that the testator stated to several persons, prior to the execution
of his will, that the spirit of his dead wife had requested him,
through a medium residing in Forty-sixth street, in the city of
New York, to make provision for his mother-in-law in his will.
To one person he said, that his wife's spirit had requested him
to give all his property to her mother, and to do it in such a
way that none of his relatives could get it away from her.   To
the same person he said, at another time, that the spirit of his
wife was constantly urging him to make a will in favor of her
mother.   To another person he said, that the spirit of his wife
had requested him to be good to her mother, and see that she
was made comfortable during the remainder of her life, and he
also said that he intended to make a will, leaving enough to his
mother-in-law to make her comfortable, because his wife wanted
him to do so.   The testator's wife, by her will, gave all her
property to the testator, subject, however, to an annual payment
of $500 to her mother, and the like sum to her brother, William
P. Williams, during their joint lives, and, after the death of
either, then to the payment of $1,000, annually, to the survivor
during his or her life.   The evidence shows, I think, beyond
doubt, that the testator believed, fully and thoroughly, that the
messages which were delivered to him, as communications from
his wife, actually came from her spirit, and that her spirit knew
constantly all that he was doing.

   The important question which this branch of the case presents
for decision is, was such belief an insane delusion?   The pre-
vailing doctrine in England, up to the time the court of Queen's
bench decided *Banks* v. *Goodfellow*, *L. R.* (*5 Q. B.*) *549*, was, that
any degree of mental unsoundness, however slight, and even if
it exercised no influence over the testator in making his will, and
was wholly unconnected with the disposition he had made of his
property, would, nevertheless, be fatal to the validity of his will.
The course of reasoning which led to the adoption of this doctrine
is stated as follows by Cockburn, C. J., in *Banks* v. *Goodfellow*
(*p. 559*): "To constitute testamentary capacity, soundness of mind

is indispensably necessary. But the mind, though it has various faculties, is one and indivisible. If it is disordered in any one of these faculties, if it labours under any delusion arising from such disorder, though its other faculties and functions may remain undisturbed, it cannot be said to be sound. Such a mind is unsound, and testamentary incapacity is the necessary consequence."

A different doctrine was established by *Banks* v. *Goodfellow*. It was there held, that if a testator possesses sufficient mental power to take into account all the considerations necessary to the proper making of a will, though he is subject to some delusion, yet if it appears that such delusion did not influence him, and was not calculated to influence him, in making his will, his will is entitled to be regarded as a valid testamentary act, and should be upheld. The principle established by that case is expressed in the following sentence of Chief-Justice Cockburn's opinion (*p. 566*): " If it be conceded, as we think it must be, that the only legitimate or rational ground for denying testamentary capacity to persons of unsound mind is the inability to take into account and give due effect to the considerations which ought to be present to the mind of a testator in making his will, and to influence his decision as to the disposal of his property, it follows that a degree or form of unsoundness which neither disturbs the exercise of the faculties necessary for such an act, nor is capable of influencing the result, ought not to take away the power of making a will, or place a person so circumstanced in a less advantageous position than others with regard to this right." All subsequent cases arising in England have been decided according to this principle, and it is now the established law of that country. *Boughton* v. *Knight, L. R. (3 Pro. & Div.) 64; Jenkins* v. *Morris, L. R. (14 Ch. Div.) 674; Smee* v. *Smee, L. R. (5 Pro. Div.) 84*. The same principle has, in its substance, been recognized by the court of errors and appeals of this State. Chief-Justice Beasley, in pronouncing the judgment of that court in *Lozear* v. *Shields, 8 C. E. Gr. 509, 511*, declared, that partial insanity was insufficient, of itself, to justify a decree setting aside a sale of real property, or any other act. He said: " Mania does not, *per se,*

vitiate any transaction, for the question is, whether such transaction has been affected by it. Where a pure defence of mental incapacity is interposed, I think the true test, in this class of cases, is, whether the party had the ability to comprehend, in a reasonable manner, the nature of the affair in which he participated. This is the rule in the absence of fraud, for fraud, when present, introduces other principles of decision." My own view as to the true rule on this subject may be stated as follows: Even if it appears that a testator was subject to an insane delusion when he made his will, but it is also made to appear that his delusion was not of a character likely to influence him, and did not influence him, in the disposition which he made of his property, his will should be declared valid.

But this is somewhat aside from the question mainly in contest on this branch of the case, namely, is a belief in spiritualism an insane delusion? Sir John Nicholl, in the celebrated case of *Dew* v. *Clark, 3 Addams 79 (2 Eng. Ecc. 441)*, defined insane delusion as follows: "Wherever the patient once conceives something extravagant to exist, which has still no existence but in his own heated imagination, and wherever, at the same time, having once so conceived, he is incapable of being, or at least of being permanently reasoned out of that conception, such a patient is said to be under a delusion in a peculiar, half-technical sense of the term, and the absence or presence of delusion, so understood, forms, in my judgment, the true and only test or criterion of present or absent insanity." Dr. Haggard's report of the opinion pronounced in *Dew* v. *Clark* attributes somewhat different language to Sir John Nicholl. The following is the definition as he reports it: "When persons believe things to exist which exist only, or at least in that degree exist only, in their own imagination, and of the non-existence of which neither argument nor proof can convince them, they are of unsound mind; or, as one of the counsel accurately expressed it, 'It is only the belief of facts which no rational person would have believed that is insane delusion.'" *1 Wms. Exrs. 35; 1 Redf. Wills 71.* Sir James Hannen, in *Boughton* v. *Knight, L. R. (3 Pro. & Div.) 64, 68*, adopted the definition as reported in *3 Addams*

as the true one. He said he believed it would solve most, if not all, the difficulties which could arise in investigations of the kind now under consideration. Chief Judge Denio, in *Seamen's Friend Society* v. *Hopper, 33 N. Y. 619, 624,* said: "If a person persistently believes supposed facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense, is insanity." And Cockburn, C. J., in *Banks* v. *Goodfellow, L. R. (5 Q. B.) 549, 560,* says: "When delusions exist which have no foundation in reality, and spring only from a diseased and morbid condition of the mind, to that extent the mind must necessarily be taken to be unsound."

According to these definitions, it is only a delusion or conception which springs up spontaneously in the mind of a testator, and is not the result of extrinsic evidence of any kind, that can be regarded as furnishing evidence that his mind is diseased or unsound; in other words, that he is subject to an insane delusion. If, without evidence of any kind, he imagines or conceives something to exist which does not in fact exist, and which no rational person would, in the absence of evidence, believe to exist, then it is manifest that the only way in which his irrational belief can be accounted for, is that it is the product of mental disorder. Delusions of this kind can be accounted for upon no reasonable theory except that they are the creations of some derangement of the mind in which they originate. To illustrate: in *Smee* v. *Smee, L. R. (5 Pro. Div.) 84,* the testator imagined himself to be the son of George IV., and that when he was born a large sum of money had been put in his father's hands for him, but which his father, in fraud of his rights, had distributed to his brothers; and in *Smith* v. *Tebbitt, L. R. (1 Pro. & Div.) 398,* the testatrix imagined herself to be one of the persons of the Trinity, and her chief legatee to be another. The delusion in both instances, as will be noticed, was indisputably a wild and baseless fancy, not the product of evidence of any kind, but obviously the offspring of a disordered condition of mind.

Middleditch v. Williams.

But where a testator is induced, by false evidence or false statements, to believe a fact to exist which does not exist, or where, in consequence of his faith in evidence which is true, but which is wholly insufficient to prove the truth of what he believes, he believes a fact to exist which in reality has no existence; his belief may show want of discernment, that he is over-credulous and easily duped, or that he lacks power to analyze and weigh evidence, or to discriminate between what is true and what is false, but it furnishes no evidence whatever that his mind is diseased. His belief may show lack of judgment or want of reasoning power, but not that his mind is unsound.

The testator's belief in spiritualism was not a morbid fancy, rising spontaneously in his mind, but a conviction produced by evidence. The proofs show that, when he first commenced attending what are called seances, he was inclined to be skeptical; afterwards his mind seemed to be in an unstable condition—he sometimes believed and at others doubted—and that it was not until the spirits gave an extraordinary exhibition of their power, by printing or painting on a pin, worn by his mother-in-law on her neck, in brilliant letters, which sparkled like diamonds, the word "Dickie," a pet name of his dead wife, that his last doubts as to the reality of the manifestations were removed. Believing, as I do, that these manifestations were correctly described by Vice-Chancellor Giffard, in *Lyon* v. *Home, L. R. (6 Eq.) 655, 682*, when he called them "mischievous nonsense, well calculated, on the one hand, to delude the vain, the weak, the foolish and the superstitious; and on the other, to assist the projects of the needy and of the adventurer," still, it seems to me to be entirely clear, that it cannot be said that a person who does believe in their reality, is, because of such belief, of unsound mind, or subject to an insane delusion. No court has as yet so held. No cases on this subject were cited on the argument. Those which I have examined uniformly hold that a belief in spiritualism is not insanity. The court, in *Robinson* v. *Adams, 62 Me. 369*, said : "Belief in spiritualism is not insanity, nor an insane delusion. * * * The term "delusion," as applied to insanity, is not a mere mistake of fact, or the being misled by false testimony

or statements to believe that a fact exists which does not exist."
And in *Brown* v. *Ward, 53 Md. 376, 393*, it was said: "The court
cannot say, as a matter of law, that a person is insane because
he holds the belief that he can communicate with spirits [of the
dead], and can be and is advised and directed by them in his
business transactions and the disposition of his property." Sub-
stantially the same view was expressed in *Otto* v. *Doty, 61 Iowa
23*, and also in the *Matter of Smith's Will, 52 Wis. 543*. The
utmost length to which any court has as yet gone on this sub-
ject, is to declare, that a belief in spiritualism may justify the
setting aside of a will, when it is shown that the testator, through
fear, dread or reverence of the spirit with which he believed him-
self to be in communication, allowed his will and judgment to be
overpowered, and, in disposing of his property, followed im-
plicitly the directions which he believed the spirit gave him, but,
in such case, the will is set aside, not on the ground of insanity,
but of undue influence. *Thompson* v. *Hawks, 14· Fed. Rep.
902*.

There is no evidence in this case which will support a conclu-
sion that the testator, at the time he executed his will, was sub-
ject to an insane delusion.

Nor do I think there is any evidence in the case which will
support a judgment declaring that the will in question is the
result of undue influence. There is no proof tending to show
what influence the spirits or the medium exercised over the tes-
tator in making his will, except that which proceeded from the
testator's own mouth. His declarations are competent to show
the condition of his mind, but not to prove undue influence
against either persons or spirits. *Rusling* v. *Rusling, 9 Stew.
Eq. 603, 607*. For the purpose of proving undue influence,
they are without the least force. Neither the medium, nor Mrs.
Williams (the mother-in-law), nor any other person who was
present at any of the seances, has been examined as a witness.
No legal evidence of what occurred at any of them is before the
court. The charge of undue influence is mainly directed against
Mrs. Williams. She is said to be a believer in spiritualism, and
the proofs show that she went with the testator frequently when

he went to the medium to consult the spirit of his dead wife. There are some things in her conduct which are calculated to create strong suspicion. Without apparent cause she seems to have entertained feelings of strong dislike towards all the testator's relatives. On the day of his wife's funeral she ordered his sister out of the house, without cause or right, and in utter defiance of the proprieties of the occasion, and after his sister refused to go, she put herself so near to the testator and his sister as to be able to overhear everything they said. From that time forward, up to the time of testator's death, Mrs. Williams continued to reside with him, and his sister never, after the funeral, went to his house, nor, so far as appears, did any of his other relatives. When the testator died Mrs. Williams not only neglected to send notice of his death to any of his relatives, but did what she could to conceal his death from them. After the testator's death she admitted that she had persuaded or gotten him to insert the clause in his will, which defers the turning over of his property to his daughter until she is twenty-five, stating that the reason she did so, was because she thought that when the daughter was of age some old fool might come after her for her money, and she wanted to protect her against such persons. And it also appears that she was present when the spirits gave the testator such evidence of their presence as he regarded conclusive, by printing on a pin on her neck, in brilliant letters, the pet name of his wife. These things naturally breed suspicions and create fears. They show that it is possible that every message the testator received, purporting to come from the spirit of his dead wife, came not from the dead, but from the living, and that everything that was done to dispel the testator's doubts and to induce him to believe in the reality of the spiritual manifestations which he witnessed was, from beginning to end, a prearranged scheme of deception and fraud. But there is no proof in the case which will support a judgment that such was the fact. There is enough to raise a strong suspicion, but not enough to produce conviction. Undue influence, like fraud, cannot, in a case where no relation of trust exists, be presumed, but must be proved. I strongly suspect that the testator was duped; it may

47

also be true that he was unduly influenced. I believe that the examination of Mrs. Williams, or the medium, as a witness, would, in all probability, have made many things, which now seem dark and obscure, plain and clear. The question, however, whether or not the paper in question is the will of the testator, must be decided by the evidence before the court. Taking that as the sole guide to the judgment to be pronounced, I think it is the duty of the court to affirm the decree made below.