Samuel Haness was killed in an accident January 9th, 1924. His will, dated February 16th, 1922, was admitted to probate by the surrogate of Morris county, January 28th, 1924. He left him surviving seven children, all of full age except the youngest, a son aged nineteen years, and a wife. He was married in 1891 and had lived with his wife and children in Brooklyn up to September, 1916, when, because of serious family quarrels, dating back at least a year, he left *Page 646 
them and lived separate from them to the time of his death. By his will he provided for the payment of his debts and the erection of a monument over his grave, and he left his entire residuary estate, in equal parts, to his two brothers and Mount Sinai Hospital, in New York City. His widow filed a petition of appeal from the probate of the will, alleging as her grounds of appeal (a) that the testator was of unsound mind and incapable of disposing of his estate by will; (b) that his brothers unduly, illegally and fraudulently influenced him to execute the will; (c) that the will is not the testator's last will, but that he made a subsequent will which was stolen and concealed by his brothers. The appeal coming on for hearing before the Morris county orphans court, the learned judge of that court found that the testator was suffering from a delusion, and was therefore incapable of making a valid will, and by his order set aside the decree admitting the will to probate. He made no finding on grounds (b) and (c) set out in the petition of appeal. The case before me is on an appeal taken from the said order of the Morris county orphans court.
The only evidence as to undue influence comes from two witnesses for the appellant below. One, Barney Drachlis, testifies that the testator told him that his brothers made him make a new will, and the other, Michael E. Haness, testator's son, testified that the testator told him that at the time he made his will the testator's brothers told the testator that testator's wife and children were crazy, and asked testator why he should leave his property to his wife and children. Both brothers denied influencing the testator to make the will, and further, that they were not aware that the testator had made a will in their favor. One brother testified that the testator once told him that the two brothers were the only persons he had who would take care of his business after he was gone. If testimony of declarations made by a testator at least a year after he had executed his will is admissible as tending to show undue influence, it should be noted that the testator always had control of his will, and if, at the time he is alleged to have made the declarations, he believed his *Page 647 
brothers had improperly influenced him to execute the will, he could have destroyed it and executed another. The controlling testimony, however, came from the New York attorney who drew the will and attended to its execution. It is sufficient to say here that this attorney had had charge of the testator's legal business affairs for a period covering four years prior to the execution of the will. The testator came to his office alone, asked him to draw his will, and stated he wished to dispose of his property to his brothers and the hospital. The attorney then questioned him, and was told of the testator's family troubles, and that the testator did not wish his wife or children to have any part of his estate. The attorney then dictated the will in the testator's presence, and when it had been typed in duplicate, handed the copy to the testator while the attorney read the original to him, the testator following the reading from the copy, after which the testator said the will was as he wanted it, and the will was thereupon duly executed in the presence of the attorney and his stenographer. The testimony is not clear as to what disposition was made of the will after it was executed, nor does it show where the will was found after the testator's death, but I gather from the attorney's testimony that he gave the original to the testator and kept the copy in his safe. If, however, this is not the correct inference to be drawn from the testimony, then the attorney kept the original in his safe and gave the copy to the testator. The circumstances under which the will was prepared and executed completely negative any thought that the testator was improperly influenced to execute a will in favor of his brothers and the hospital.
An attempt was made to prove that the testator had executed a subsequent will which was found and concealed by the testator's brothers. The day after the testator was killed the two brothers came to Dover, and, after viewing the body, visited the rooms occupied by the testator at Dover. A son of the testator testified that immediately after that visit he saw one of the brothers take a large envelope with a red seal on its back from a handbag owned by the testator, but the witness did not know what the envelope contained. The further *Page 648 
testimony to establish another will came from witnesses for the appellant below as to various declarations made by the testator covering a period from April, 1923, to a few days before he was killed. To some of the witnesses he is alleged to have said that he intended to make a will in favor of a son and daughter; to some he is alleged to have said that he had made a will in favor of all his children; to some he is alleged to have said that he had given his house in Dover to his daughter; to some he is alleged to have shown a large envelope with a red seal on its back, at the same time stating that the contents of the envelope provided for the same daughter after his death. The testimony for the proponents shows the following facts conclusively: That on the occasion of the visit of the brothers to the rooms occupied by the testator the day after he was killed, they were accompanied by three friends of the deceased, wholly disinterested in the disposition of his estate; that the contents of the testator's desk were then examined in the presence of all five persons, and nothing of importance was found therein other than a list of names of persons who the testator desired should be notified in the event of his death, which list was the only paper, envelope or property removed from the rooms; that all five persons left the rooms together, and when they left the tenant who occupied the rooms below those occupied by the testator fastened a padlock on the door of the testator's rooms and kept the key; that neither of the two brothers entered the testator's rooms again until after the will here in question had been probated, when they came with an attorney and two appraisers and made an inventory of the testator's personal property; that on this occasion no subsequent will was found. The attorney who offered the will for probate continued, after the execution of the will, to transact legal business for the testator to the time of his death, and he drew no other will for the testator. There is no testimony that any other person drew a will for or witnessed a will executed by the testator or saw a will which had been executed by the testator. It is admitted that the will here attacked was executed with all legal formalities. It could be revoked only in *Page 649 
the manner provided by statute, that is, by burning canceling, tearing or obliterating it by the testator, or by his direction, or by a writing executed with the same formalities as the will itself. No proof of declaration of revocation made by the testator will avail the appellant below and the evidence as to the declarations of the testator that he had made or intended to make another will was hearsay and should not have been admitted.Boylan v. Meeker, 28 N.J. Law 274; Randall v. Beatty,31 N.J. Eq. 643; Pemberton's Case, 40 N.J. Eq. 520; Gordon's Case,50 N.J. Eq. 397; State v. Ready, 78 N.J. Law 599. The appellants below have failed utterly to show that there was another will subsequent to the will offered for probate.
The remaining ground for appeal from the probate of the will was that the testator was of unsound mind and incapable of disposing of his estate by will. The testator was a dry-goods salesman for many years — I gather that he was a drummer — and he continued to attend to his business up to the time he was killed. His sample case was found with his body. Besides this business, he speculated in real estate and had bought four pieces of real estate after he separated from his wife and prior to the execution of his will, and he bought three other parcels of real estate after the execution of his will. He was shrewd enough to have a corporation formed to hold title to his real estate, undoubtedly to avoid trouble over his wife's dower. Eleven disinterested witnesses, in addition to his two brothers, testified for the proponents. They had known the testator prior to and after the execution of his will, and had talked with him on general business conditions, of the topics of the day and of his family, and all describe him as a normal man, showing no evidence of any mental disturbance, or even bad temper. Witnesses for the appellant below described him as an excitable man, of quick and violent temper, easily enraged without cause, but the only concrete evidence of any mental trouble outside of bad temper and epithets applied to his wife and family comes from three witnesses. Eva Leopold, who had known him nine years and had kept house for him several years up to October, 1922, testified *Page 650 
that in or about September, 1922, he got out of bed about nine or ten o'clock at night and said: "Let me get out of the window, my other brother is praying, let me go help him. I hear by father is calling me; hear, my mother is calling me," and he started to walk through the window. She left his house the next day because she was afraid of him. She further testified that about May, 1922, he struck her young son because the boy threw a crumb on the floor. Barney Brachlis, who lived in the same house with the testator from 1906 to 1913, and who, during the three years prior to the testator's death, saw him about once a month, testified that in 1909 or 1910, while the testator was living with his wife, he heard the testator quarrelling with his wife in the middle of the night and call out that she had poisoned him. Tobias Haness, a son of the testator, testified that in 1913 his father took him to buy a graduation suit, and because he asked for a pair of long pants his father got mad and yelled at him on the street or in the store, and then bought him both long and short pants, and when later the same day he said something to his father which he thought funny his father slapped him across the face and said he would give the son $1,000 to change his name. It will be noted that these witnesses have been in close contact with the testator many years, and during the period of their respective acquaintance with them they point out but a few instances of peculiar conduct, only one of which (the striking of Mrs. Leopold's boy) occurred near the date of the execution of the will, and all of which might occur with a man of sound mentality.
Our courts guard the right of testamentary disposition jealously. They hold that this right may be exercised by a person of very moderate capacity. He must have a sound and disposing mind and memory, but his memory may be very imperfect; he may not be able at all times to recollect names, the persons or the families of those with whom he has been intimately acquainted; he may at times ask idle questions and repeat those which have been asked and answered; he may not have sufficient strength of memory and *Page 651 
vigor of intellect to digest all parts of a contract and yet be competent to make a will. If he is capable of recollecting of what his property consists, and who, either in consequence of ties of blood or friendship, should be objects of his bounty and has a mind sufficiently sound to enable him to know and to understand what disposition he wants made of his property after his death, he is competent to make a valid will. Ward v.Harrison, 127 Atl. Rep. 691. A will may be contrary to the principles of justice and humanity; its provisions may be shockingly unnatural and extremely unjust, nevertheless, if it appears to have been made by a person of sufficient age to be competent to make a will, and also to be the free and unconstrained product of a sound mind, the courts are bound to uphold it. Middleditch v. Williams, 45 N.J. Eq. 726; In reYoung, 90 N.J. Eq. 236.
Up to this point in the discussion of the case, the testimony clearly shows that the testator, at the time he executed his will, had ample testatmentary capacity, and that it was the free and unconstrained product of his mind. But the court below found that the testator was suffering from a delusion that his wife and children were crazy and were murderers, and, because of such delusion, he was incapable of making a valid will. I assume the court meant that, because of such delusion, the testator was unable to comprehend his wife and children as natural objects of his bounty, or to appreciate the duty which should have recommended them for his consideration. It is only a delusion or conception which springs up spontaneously in the mind of a testator, and is not the result of extrinsic evidence of any kind, that can be regarded as furnishing evidence that his mind is diseased or unsound. It is not required of a testator that he shall, in fact, correctly ascertain the legal status of each person who stands in natural relation to him. In the exercise of reason he may move on premises established by false or insufficient evidence, or by mistake, and thus determine to exclude from his bounty those whom, but for his error, he would have recognized. The test is his ability to exercise reason and reach a rational conclusion, *Page 652 
however erroneous, with reference to them. Stupid error in either his reasoning or conclusion is not lack of testamentary capacity.Middleditch v. Williams, supra; Smith v. Smith, 48 N.J. Eq. 566; Davenport v. Davenport, 67 N.J. Eq. 320.
Back as far as January, 1916 (and probably further), there was trouble between the testator and his wife, and the children seem to have sided with their mother. Their then troubles resulted in the testator entering into a written agreement for the support of his wife and children. He left her in September, 1916, and about that time he commenced suit against his wife to compel her to convey to him certain property in Brooklyn, title to which was then in her name, but which he claimed was his. In August, 1917, the husband and wife entered into another written agreement by which they agreed to live separate for the remainder of their lives, and to convey the Brooklyn property to the wife and another person as trustees, to hold for the benefit of the wife and the children, and, after the death of the wife, to convey said property to the children. In addition to the income they were to receive from the property, the testator agreed to pay his wife a monthly sum for the support of herself and children. When speaking of his wife on subsequent occasions, he maintained that the blame for his family troubles was wholly hers; that her conduct toward him and her treatment of him made it impossible for him to live with her; that his children, or some of them, had ill-treated him, and that when he gave to them the Brooklyn property (which apparently was all the real estate he then owned) they had taken from him all he had, and it was because of the treatment that he felt he had received at their hands, he occasionally called them crazy and murderers, and said they had robbed him.
It is conceded that they were not crazy or murderers. In his marital troubles the testator evidently believed himself wholly blameless and his wife entirely wrong, and the treatment he received from her may, to his mind, have been so unjust and her part in their quarrels may, in his opinion, *Page 653 
have been so violent and harrassing; that he could only account for her conduct upon the hypothesis that her mind was affected, and, reasoning from his relations and experiences with her and from his point of view, he said she was crazy. While they were living together, he charged her with having poisoned him, and a physician was sent for. He must have had some ground which, to my mind, justified the charge, and so in after years he occasionally spoke of her as a murderer. Assuming that, for the reasons I have stated, he actually believed, as a fact, that she was crazy and a murderer; his belief was founded on what appealed to his reasoning powers as sufficient evidence, and while he may have shown want of discernment, or that he lacked power to analyze and weigh evidence, or to discriminate between what was true and what was false, it does not follow that he was suffering from an insane delusion. Middleditch v. Williams, supra; Smith v.Smith, supra; Davenport v. Davenport, supra.
He did not always speak of his wife and the children as crazy and murderers. Witnesses for the proponents say that he spoke of his wife and children, and of his trouble with them, without calling them names, and his ill-feeling toward his children seems to have abated somewhat, because he visited them and some of them visited him, but his feeling towards his wife never changed. I do not believe that the testator actually thought his wife and children were crazy or murderers, but that he used these word as epithets to indicate his dislike or hatred for them. The testimony for the appellant below describes him as an excitable man, of hasty and violent temper, and it appears that he usually made use of these epithets when talk concerning his wife and children aroused him to anger. When he went to his attorney to have his will drawn, he told the attorney of his family troubles, and said that he had not found it possible to live with his wife because of the trouble she created; that she had taken every dollar he had and that he had turned everything he had over to her and his family, and that he did not want his wife and children to have any part of his *Page 654 
estate. He did not then give as his reason for cutting off his wife and children that they were crazy or murderers, and he had his attorney insert in his will, "I have made no provision for my wife and children for reasons well known to them." He could not have believed that his wife was crazy in 1917 when he conveyed the Brooklyn property to her to hold as trustee and to collect and expend the income therefrom, nor could he have believed she was crazy when he continued to make payments to her after 1917 under the agreement for the support of his wife and children; nor could he have believed that his wife and children were murderers, for they had not killed him; nor could he have believed that his children were crazy when he continued to see and converse with at least four of them down to the time of his death and (according to witnesses for the appellant below) intended to or had made a will in their favor, and had sent a daughter to the country and had given her money and had told her he would deed a house to her, and had sent a son to the country and had given the son's wife money to pay the rent while her husband was away and knew that his sons were in business. We commence our consideration of this case with the presumption in law that the testator was sane and mentally capable of making testamentary disposition of his estate. Consideration of all the testimony leads me to believe that, except for the alleged delusion, he was mentally competent to make a will. The burden of proving that he suffered from an insane delusion, in consequence of which he was unable to comprehend his wife and children as natural objects of his bounty, is on the appellant below, and I conclude that she has not sustained that burden.
 The decree of the Morris county orphans court will be reversed. *Page 655