Smith *v.* Smith.

---

ANDREW J. SMITH et al., appellants,

*v.*

EVELINE VERONA SMITH et al., respondents.

1. When an orphans court has certified the questions involved in a contest over the probate of a will to the circuit court for trial by jury, pursuant to the statute (*Rev. p. 756*), and an appeal is taken to the prerogative court from the decree of the orphans court made upon the return of the circuit judge, the ordinary, determining the appeal, is not limited to a review of the propriety of the decree of the orphans court upon the matters submitted to that court's judgment, nor is he restricted in any way by the determination of the issues considered at the trial in the circuit court. Whether the paper shall be admitted to probate as a will, is presented to him as an original question, which he may determine either upon the evidence taken upon the trial in the circuit, or upon that evidence supplemented by other proofs, or upon new proofs, at his discretion.

2. It is one of the requisites of testamentary capacity that, at the time of making his will, the testator shall possess ability to comprehend those who appear as the natural objects of his bounty, and appreciate the duty which recommends them for consideration. In determining whether certain persons are such objects, he must possess ability to reach a rational conclusion, however erroneous, with reference to them.

Smith v. Smith.

3. A delusion is the mind's spontaneous conception and acceptance of that, as a fact, which has no real existence except in its imagination, and its persistent adherence to it against all evidence.

4. The presumption of law is in favor of capacity. The law looks upon an inofficious will with suspicion, but, if it can be accounted for on other reasonable hypotheses, it will not be attributed to mental incapacity.

5. The testimony of witnesses as to oral declarations belongs to a class of proofs which should be received with great caution, and only after critical and suspicious examination.

6. If a testator, in making his will, observes the formalities required by the statute, is of certain age and possesses mental capacity, he may lawfully make an unjust will.

On appeal from decree of Burlington orphans court.

*Mr. Mark R. Sooy* and *Mr. Theodore Runyon*, for the appellants.

*Messrs. Joseph H. Gaskill, Samuel H. Grey* and *Cortlandt Parker*, for the respondents.

THE ORDINARY.

The decree complained of reverses an order of the surrogate of Burlington county, made on the 14th day of November, A. D. 1887, which admitted to probate, as the last will of Hezekiah B. Smith, a paper, bearing date the 4th day of August, A. D. 1886, purporting to be such will, and, at the same time, refuses to admit that paper to probate as the will indicated.

Hezekiah B. Smith died at Smithville, in Burlington county, on the 3d day of November, A. D. 1887, one year and three months after the disputed paper was signed by him. Eleven days after his death the paper was offered for probate to the surrogate of Burlington county by nine persons named in it as its executors, and, by the surrogate's order, was duly admitted to probate as Mr. Smith's last will.

In the petition for probate it was alleged that the testator's heirs at law and next of kin were Laura Cobb, a sister, and Elliott Smith, a brother.

On the 8th of January, A. D. 1888, Eveline Verona Smith, Ella A. Fuller, Elton A. Smith and Eugene Smith, claiming to

be respectively the widow and children of Hezekiah B. Smith, appealed from the surrogate's order for probate to the orphans court of Burlington county. In their answer to the petition of appeal the executors, among other things, denied the *status* claimed by the appellants as widow and children of the decedent, and thereupon the hearing of the appeal was stayed until an action, commenced by Eveline Verona Smith, against the executors, for the recovery of dower, could be determined. The dower suit was duly tried, resulting in a judgment in favor of the plaintiff, which was thereafter sustained in the supreme court and also in the court of errors and appeals. *Smith* v. *Smith, 23 Vr. 207.*

Upon the affirmance of that judgment by the court of errors and appeals, the executors amended their answer to the petition of appeal to the orphans court, by striking out of it their denial of the legal *status* claimed for the appellants, and thereupon, on the 9th day of April, A. D. 1889, under authority of the statute (*Rev. p. 756*), the orphans court certified the questions involved in the appeal to the circuit court of Burlington county for trial before a jury. Later, in May, A. D. 1890, the judge holding the circuit court framed issues for the trial of the cause. Those issues were as follows:

"*First.* Whether the paper purporting to be the last will and testament of Hezekiah B. Smith, deceased, presented for probate, was signed, witnessed, published and declared by him as his last will and testament according to the statute in such case made and provided?'

"*Second.* Whether the said Hezekiah B. Smith was, at the time of making and declaring said paper purporting to be a will, of sound mind, memory and understanding, sufficient to make and publish a will?

"*Third.* Whether the making, signing and publishing of said paper purporting to be a will was procured through undue influence, imposition or fraud, from or by the devisees or legatees named in said paper writing or by any other person or persons?

"*Fourth.* Whether the said paper, purporting to be a last will propounded for probate by the proponents, was the last will and testament of Hezekiah B. Smith, deceased?"

Smith *v.* Smith.

Upon these issues the case was brought to trial in October, A. D. 1890. The trial resulted in an affirmative answer upon the first issue and a negative answer upon each of the remaining issues, so that while it was held that the paper was duly executed as a will, and that such execution was not procured by fraud, imposition or undue influence, it was decided that, at the time the paper was executed as a will, Hezekiah B. Smith was not of sound mind, memory and understanding, sufficient to make a will, and that the disputed paper was not his will.

When the trial was concluded the circuit judge made return to the orphans court as the statute requires, and, thereupon, the orphans court made the decree here appealed from.

The jurisdiction of the ordinary, in a case of this kind, is not limited to a review of the propriety of the decree of the orphans court upon the matters submitted to that court's judgment, nor is it restricted in any way by the determination of the issues considered at the trial in the circuit court. Whether the paper shall be admitted to probate as a will, is presented to him as an original question, which he may determine either upon the evidence taken at the trial in the circuit or upon that evidence supplemented by other proofs, or upon new proofs, at his discretion. *Rusling* v. *Rusling, 9 Stew. Eq. 603.*

The case at the circuit was ably and exhaustively presented to the jury, and it has not been suggested that other material evidence, upon the issues it presents, can be had. I then approach the questions I am to deal with upon the proofs that were considered by the jury at the circuit. That question, shortly stated, is whether the disputed paper is the last will and testament of Hezekiah B. Smith.

The paper provides that the remainder of Mr. Smith's estate, after the payment of his debts, shall go to nine persons named, as a board of trustees (they having power to fill vacancies in their number) in trust, and the trust is defined as follows:

"The property and estate herein bequeathed is to be held in trust by the said board of trustees for the following objects, namely: I desire that my estate, with its accumulations, shall be used in establishing and conducting a school for apprentices and young mechanics, on plans to be hereafter described

by me, or, in case of my death before perfecting said plans, the school above·
named is to be conducted on plans which I have from time to time described
to most of the board of trustees herein named, and who shall approve of final.
practical plans in keeping therewith."

In the argument before me the admission of this paper to·
probate was contested upon two grounds, viz. :

*First.* That because of an insane delusion, on the part of Smith,.
that he had not been able to procreate his children, he failed,.
at the time when the paper was executed, to comprehend his
children as natural objects of his bounty ; and

*Second.* Because the paper was the product of an undue
influence exerted by a deceased paramour.

That the paper was executed with all the formalities which
the statute requires, was not questioned. It has been held in
repeated adjudications in this state, that it is necessary to testa-
mentary capacity that, at the time of making his will, the testa-·
tor must possess ability to comprehend those who appear as·
natural objects of his bounty, and appreciate the duty which
recommends them for consideration. It is not required that he·
shall in fact correctly ascertain the legal *status* of each person
who apparently stands in natural relation to him. In the exer-
cise of reason, he may move upon premises established by false·
or insufficient evidence, or by mistake of law, and thus deter-
mine to exclude from his bounty those whom, but for his error,
he would have recognized. The test is his ability to exercise·
reason and reach a rational conclusion, however erroneous, with
reference to them. Stupid error in either his reasoning or con-
clusion, is not lack of testamentary capacity. But it is otherwise·
if he suffers from delusion. A delusion is the mind's spon-
taneous conception and acceptance of that, as a fact, which has.
no real existence except in its imagination, and its persistent
adherence to it against all evidence. *Middleditch* v. *Williams,.*
*18 Stew. Eq. 726.*

Mistake, whether of fact or law, moves from some external
influence which is weighed by reason. Delusion arises from
morbid internal impulse, and has no basis in reason.

Smith *v.* Smith.

The insistment in behalf of the respondents here is, that Hezekiah B. Smith could not comprehend them, because when he made his will he labored under the delusion that he was childless, and never had had power to procreate a child. The burden is upon the respondents to clearly establish the truth of this proposition. The presumption of law is in favor of capacity. The law looks upon an inofficious will with suspicion, but, if it can be accounted for on other reasonable hypotheses, it will not be attributed to mental incapacity.

The legal *status* of Eveline Verona Smith, as the wife of Hezekiah B. Smith, is fully established in this case, both by uncontradicted evidence and the record in the dower suit.

She was married to Smith in 1846. Two months after the marriage she gave birth to the respondent, Ella Fuller, and, while Smith cohabited with her as her husband, she gave birth to three sons, Elton, who was born in March, 1848; Eugene, who was born in May, 1850; and Edward, who was born in May, 1853, and died in 1879.

In this inquiry the endeavor is to ascertain Mr. Smith's mental condition, and, notwithstanding there can now be no question as to Mrs. Smith's legal *status* as his wife, it is important to know whether there were any circumstances to lead Smith in the exercise of his reason, rightly or wrongly, to otherwise regard it. His repeated declarations to several persons that she was not his wife, indicate his rejection of the *status* that the courts have accorded her. How did he reach his conclusion? He said, to one person, that she came to him in trouble and he took her to Charlestown, Massachusetts, and had a friend marry them, and to another that he pretended to marry her in Boston. It has never been affirmatively proved that the person who performed the marriage ceremony was clothed with legal authority. The marriage, which the courts recognize, has been established by inference and presumption. The birth of the daughter, Ella, shortly after marriage, is a circumstance corroborative, at least, of that part of Smith's declarations, that when he married her she was in trouble, and to that extent proves their sincerity. It is perceived, if the ceremony of marriage was intended by

Smith to be deceptive, how, thereafter, he may have failed to appreciate that his contrivance of a pretended marriage did not avail him, especially in view of the fact that Mrs. Smith never, during his life, although she was abandoned and knew that her husband was living with another woman, took means to legally assert her rights as his wife. He proceeded upon insecure premises, but he evidently reasoned, or, at least exhibited capacity to reason, by indicating premises from which it was possible for him to draw his conclusion.

He was a mechanic, and, from 1846 to 1855, was occupied in traveling from place to place building and selling wood-working machinery. Prior to 1855 he established himself in business at Lowell, Massachusetts, and there lived, making visits from time to time to his wife and children, at Woodstock, Vermont, where he left them. The evidence shows that, at these visits, he treated the children as his own, bestowing upon them many marks of fatherly affection. During his absence from home he frequently wrote to his wife, recognizing her as such, and referring to their children. None of his letters, however, betray any considerable depth of affection for her, and, when they are read in chronological order, they exhibit a gradual decline of concern for both wife and children, until they become merely curt business communications.

In 1853, he met Agnes Gilkerson, at Lowell. She was then a young girl, about sixteen years old, who had come from a country town in Vermont, to find employment in one of the factories there. A few months later, this girl was living with him, unquestionably as his paramour, and he had commenced to educate her. She evidently possessed unusual attractions. One witness describes her, as she appeared to him in 1878, in this language:

"She was one of the most elegant entertainers and the finest hostess I have ever met in my life; a lady of great ability, a fine conversationalist, a well-disposed-looking lady, as fascinating a woman as I almost ever came in contact with."

And another witness says:

."She was a woman I would consider decidedly intellectual, above the aver-
age; very brilliant in conversation, quite spicy, and, altogether, a very fine-
looking and fascinating lady."

It cannot be doubted that Smith was infatuated by her, and
that she fully realized her power over him. As early as 1857
she told an intimate female friend that Smith had a wife and
family in Vermont, that he was going to get rid of her, and that
she meant to stop his visits to them ; that he was spending, too
much money on the wife, and that she intended to make him
come to a settlement.

The evidence discloses that he not only sent her to school in
Lowell, but that, in 1859, he took her to Philadelphia, where,
for two years, at his expense, she studied medicine in one of the
medical colleges in that city. While she was in Philadelphia
Smith exhibited his infatuation by declaring to a friend that he
loved her, and did not care who knew it.

When the medical course was concluded, she returned to
Lowell, and she and Smith remained together until the fall of
1865, when they removed to Smithville, in this state, where he
built a large factory and numerous houses for his workmen, and,
at the same time, provided himself with a commodious and
comfortable mansion house, over which he installed Agnes as
mistress. Here Agnes was called Mrs. Smith, and was recog-
nized as his lawful wife.

Before a complete abandonment of his lawful wife, Smith
destroyed as much of his correspondence with her as he could
lay his hands upon, and then deeded to her the house, in which
they had lived at Woodstock, by her maiden name, Eveline
Verona English. His pretext to her for the abandonment was,
that she had accepted from his sister some articles which had
belonged to his father and mother, after he had declared that he
would not accept any part of their estate.

After he went to Smithville to live, he never saw his wife
again.

For some three years before leaving Lowell, he had his son
Elton with him, in the capacity of clerk. He then recognized
Elton as his son, and expressed the intention of taking him to

Smithville. Agnes, however, hated Elton, and declared that she would not have him where she was, and, at one time, betrayed her hatred so far as to declare to a friend that she would like to plunge a dagger in his heart. It was in the bitterness of this dislike that she declared to Elton that his father and mother had never married. It is important to note that on this occasion Elton appealed to his father, who then assured him that he was his legitimate son.

Upon the removal to Smithville, Elton accompanied his father and Agnes. But he remained only a short time. Agnes's determination not to tolerate his presence was unmistakable, and one day his father, forgetful of his previous assurance to the boy that he was his legitimate son, told him that he, the father, was not bound to the mother, and would never live with her again, if there was not another woman in the world. Upon this cruel announcement Elton left Smithville, went to sea for several years, and then settled at Savannah, Georgia, where he was living at his father's death. He never saw his father again.

Eugene visited his father at Lowell, in 1862, for three weeks, and was received and treated as a son. After the removal to Smithville he again, in 1871, visited his father and remained over a single night. At that time his father gave him $100, and he returned to Woodstock. In the fall of the same year, when he was traveling in the west, Smith sent him more money. In the spring of 1872, he again visited Smithville, staying over night at a boarding house there, and his father then gave him money. He met his father next at the Grand Central depot in New York, by appointment, in 1878, and after the year 1881 again visited his father for a night at Smithville. At this last visit he tried to get his father to give him a steam engine, but failed to obtain it.

It appears that Edward also visited his father, at Smithville, in 1875, and that his father gave him money, saying to Edward Burns, whom he sent to the machine works for money, " This young man agrees to go away and stay away, if I will give him money."

Smith v. Smith.

That the visits of these sons were obnoxious to Agnes Gilker-·son plainly appears in the evidence. It is shown that she made anxious inquiries, when they came, from others than Smith. Her antagonism to them was unrelenting. Smith exhibited ·some parental weakness by secretly, so far as Agnes was con-·cerned, meeting them, and quieting them with money. The ·attitude of Agnes is illustrated by the following episode and remark : Elton was accustomed to call his father " Father," and ·once, while at Smithville, shortly before his father denied con-jugal obligation to his mother, did so at the table, whereupon Agnes spitefully repeated the word " father " and left the room, ·and afterwards, in the drawing-room, said to Mr. Smith : " The boy apes you, watching every move you make and aping you, to ·make you believe he is yours."

It was about this time that Agnes told Levi Houston and his ·wife that Smith could not procreate a child ; that she knew it ·by her medical skill, and that she knew that his children could ·not be his.

Smith's denial of his children dates from this time.

It is urged for the respondents that the denial was the product ·of a delusion that he could not have been their father, while for the proponents it is insisted that the denial was a falsehood in furtherance of the joint and several desires and ambitions of ·Smith and Agnes.

In the light of these insistments it is important to state other ·dates. In 1876, 1878 and 1880 Mr. Smith was a candidate for ·election to the national congress. He was defeated in 1876 and 1880, but elected in 1878. Subsequently, in 1882, he was ·elected to the state senate, in which he represented Burlington ·county in the years 1883, 1884 and 1885. Agnes died in Janu-·ary, 1881.

The testimony bearing upon these insistments is quite volumin-·ous, but it may be stated within comparatively narrow compass. The first witness, Charles Raymond, testified that one night, upon a boat plying between New York and Albany, in the fall ·of 1865 (I think the witness means to say *1866*), Mr. Smith ·talked to him about having repudiated his family, and at the

Smith *v.* Smith.

same time stated that he had no children, and was not able to get any.

The examination of this witness did not disclose the entire conversation with Mr. Smith. He does not pretend to give that part of it which touches upon the repudiation of the family. There evidently was more said than the witness disclosed. His testimony is not satisfactory. I cannot but conclude that he has given a single expression, in a conversation that may have qualified that expression. His testimony is not only subject to just criticism on this ground, but also for the reason that during the summer before the witness was sworn, and while this controversy was pending, he was the guest of Elton Smith, in Vermont.

Levi Houston knew Smith for many years. He remembers that at Lowell Smith acknowledged and treated Elton as his son; that at Smithville he declared that he had never been married, and, at first, that part of Eveline's children were not his, and then that none of them were his, and that this was said about the time when Agnes stated that, by her medical knowledge, she knew Smith could not beget a child.

He speaks of an instance that happened at Smithville in 1868, about eighteen months after Smith went there. A tailor sent Smith a bill for an overcoat he had made for Elton, and Smith declared that Elton was not his son, and that he would not pay the bill. Houston says that he told Smith that he was an old rascal and a liar, and that he should pay the bill, and afterwards that Smith did pay the bill, through him.

These two witnesses are the only persons who speak of Smith's denial of his paternity of his children prior to the political campaigns in which he was a candidate for office. The next testimony concerns, principally, the political campaign of 1878, when he was elected to congress. In that campaign he appears to have been severely denounced for his desertion of his family. The attacks were of so virulent a character that one of the witnesses, William B. Rankin, who was advocating him upon the stump, told him that he could not afford to allow the attacks to go unanswered. To this witness Smith said, "Judge, it is a

Smith *v.* Smith.

d——d lie. It is a d——d lie from beginning to end. I was never married. I never had any children." He added that he " never could have a child; it was impossible." This witness also says, quoting his language :

"He told me that when he was a younger man he had become acquainted with a girl up at his place, as he called it, floating around, and that she was a woman of loose character; that he had kept her a long while, and he said that he gave her his money and he was taking care of her now; that there might be some children there, but he could not tell whether they were his or anybody else's; he did not know where they were, and that he had never married her. He said that when he wanted to marry Mrs. Smith, and to bring her to preside over his house, that he had provided for her well, and he had paid her for everything that had taken place."

The advice of Judge Rankin was evidently heeded, for, at a public political meeting, Smith announced that he had every reason to believe that he never was a father, and, at the same meeting, had a woman interpret the same statement to a German editor of a newspaper.

During this campaign he wrote to his wife and son Eugene to meet him at the Grand Central depot in New York city, with the purpose of making a settlement, which would result in his wife's signing papers, " to stop the talk in the newspapers."

About this time he met the witness, Charles H. Smith, who said, " These politicians seem to be pushing you pretty hard, Mr. Smith." To which he replied, " Oh, campaign fire altogether ; d——d lie."

He also said to a Mrs. Cook, who spoke to him about a newspaper article attacking him, that " he hadn't any children."

Immediately after this campaign, Agnes Gilkerson prepared the following card for publication in the " Mount Holly Herald," which he signed :

"*Editor Mount Holly Herald:*

" The story that has gone the rounds of the papers that I have a wife and family in Woodstock, is utterly false. I never married Verona Eveline English; never pretended or gave her any reason to think she was my wife; never lived with her in any such relation, and have every reason to believe I am not nor ever was a father.

"It is true that when I got ready to leave my native state, Eveline Verona English, an acquaintance, came to me for assistance, as she was in serious trouble, and, through her importunities and my sympathy for her unfortunate condition, I aided her. She was never in Boston or Lowell four hours, to my knowledge, in her life. The story she may have told I am not responsible for.

"HEZEKIAH B. SMITH."

Joseph S. Hulme testified that about this period, while one day he drove with Smith from Smithville to Mount Holly, he expressed anxiety about one of his children who was ill, and Smith said that he, Smith, had some children charged to him, and that he did not know that they were his, but he wished he did.

The witness Augustus M. Hall states that, in the political campaign of 1880, when Smith was last a candidate for congress, he told Hall not to believe the newspaper attacks; that they were political lies; that he had no wife or children. This, Hall says, was repeated more than once, and in such a way that he became satisfied that Smith desired to impress it upon his mind. At one of these denials he says Agnes was present, and so acted as to impress him that she wanted to express her disgust at the mere suggestion that the attack might be truthful.

Samuel Bower, who kept a news-stand in Mount Holly, testified that, in 1880 or 1882, while talking about the campaign stories, Smith said that they were lies, and that he had reason to believe that he could not be the father of children.

Mary Bishop was Smith's cook, from 1880 to 1882. She states that Smith told her, using her language, "If he ever was a father, he never knew it."

While he was in congress, he said to George Pressey, a blacksmith, that he had no wife or children.

Sarah Howell, a dining-room servant, says that, in 1881 or 1882, she heard him say, at the dinner-table at which he had guests, that he never was the father of a child.

This remark was probably made at a dinner which Mr. Smith gave to the late Mr. Justice Parker, of the Supreme Court, in the spring of 1881, who then had just commenced to preside over the Burlington Circuit Court.

This dinner was given shortly after Agnes's death. The evidence shows that Smith stated, at it, that he contemplated the

devotion of his estate, at his death, to the establishment and support of a school for young mechanics, and that he desired the gentlemen present to make suggestions upon the subject. He said that he got the idea of the school from Alexander H. Stephens, of Georgia, who had been in congress with him.

It is proved that, in August, 1879, while Agnes was alive, Mr. Stephens visited Mr. Smith, and, while at Smithville, made an address in the opera house, at which he spoke of having aided many young men in obtaining an education.

After the dinner to Mr. Justice Parker, the intended disposition of his property, in the establishment of a school, became a topic frequently mentioned by Mr. Smith.

This scheme appears, from Smith's declarations, to have been the wish of Agnes.

The witness Rankin declared to Smith that it was "humbug," and Smith replied to him that Mrs. Smith had wished it so.

He made three or four wills to carry out his project, and at one time, in 1884, while discussing one of them with a witness, Allan Thompson, said that perhaps Thompson would think it a strange will, but that he had talked it over with Agnes before she died, and that she had expressed a wish that he should dispose of his property for the benefit of the rising generation, and he had done it according to her wishes.

It was after he had declared his intention to found the school that he made the other remarks concerning his paternity, that are relied on in proof of delusion.

He spoke to Furman Dubel, after 1884, and said to him that he was going to found the school, that he had "no near relatives, no children," and he asked Dubel if he knew of a similar charity.

In 1885 he pointed out his property to Irene Van Fossen while driving with her, and said that he had neither "chick" nor "child."

In the same year, while endeavoring to persuade a newspaper editor to abuse a public man, against whom he cherished animosity, he declared that he would have a specified revenge at any

cost, and then added something about having no relatives. The witness says:

> "He said he didn't have any children, he was not the father of any children and never had been, or something that amounted to about that—I don't quote the exact language."

In the same year he offered Clifford S. Sims the presidency of the "H. B. Smith Machine Co.," the corporation under which he operated his factory. The salary offered was small, and Sims desired to know how permanent it would be, and consequently asked Smith what his plans for the future were, to which Smith replied, that he would leave the property to trustees for a school, and that Sims should be one of those trustees. Sims took supper with him that night, and after supper was with Smith in the card-room, when Smith suddenly broke silence with the remark that he had not a child in the world.

On the day the will was made, he told William H. Mason that he did not know that he had any children, or, the witness says, "Something to that effect." I do not place much reliance in this witness. He was badly damaged upon cross-examination and by contradictions.

The witness who last heard him deny having children states that in 1887 Smith visited him in New Hampshire, and while on his veranda one day, explained to the witness's sons that he intended to devote his property to founding a school for mechanics. After the sons had gone away the witness said: "Mr. Smith, have you ever made any provisions for your wife and children at Woodstock?" and he replied, "I ain't got any wife and children, nor never was capable of having any children."

The proofs disclose that he made four wills in all. The first one in 1872, by which, with the exception of a bequest of a few shares of railroad stock to his brother, he gave his entire estate to Agnes, and made her sole executrix of the will. The second was drawn in 1881, soon after Agnes's death, but was not executed. By it he devoted four acres of land to cemetery purposes, and directed that a monument, to cost from $3,000 to $10,000, for Agnes and himself, should be erected. The re-

mainder of his estate he devoted to the establishment of a school to educate young men in mechanics and English. The next will was made in August, 1881. It was executed. By it $5,000 was devoted to the monument for Agnes and himself, and $5,000 to keep that monument in repair. An annuity of $500 was given to Agnes's sister, four acres of land were devoted to cemetery purposes, and the residue of his estate was given to trustees to carry out the school scheme.

In 1883 he had another will drawn by a man named Kelly, which gave an annuity of $100 to Elvira Latimer, and contained similar provision for a school. He was ill when this will was made, and when asked if there were not a wife and children to think of, answered " None." ·

In the spring of 1884 Nathaniel Fennimore drew a will for him, which entered at some length into regulation of the proposed school. In this will it was provided that if the income of his estate should be more than sufficient to answer the purposes of the school as prescribed by him, that the scope of the charity should be enlarged so that the surplus should not " go to the heirs at law," and also provided that, in case a *caveat* should be filed, his executors were to expend a sum necessary to prove the will.

Mr. Fennimore states that Smith dictated this will, and that he, Fennimore, took notes, and afterwards drew the will according to those notes; that Smith did not, in his dictation, use the term " heirs," but spoke of his brother and sister, whom the witness intended by the expression in the will referring to heirs. He and Smith, however, discussed the passage relating to a *caveat* and agreed upon it. This will, when drawn, was not satisfactory and was not executed.

The next will was the one here disputed.

It does not appear that, in giving instructions for any of the wills, Smith mentioned either his wife or his children.

The declarations stated, and the wills, constitute the entire evidence bearing upon the question, whether the testator labored under delusion that he was not, and could not be, the father of his children.

As has been said, the burden of establishing that there was such a delusion is upon the respondents. They seek to bear it by putting in evidence declarations made by Smith after he had deliberately and permanently abandoned his wife and children. That he intended a permanent repudiation of his wife, is demonstrated by his destruction of his letters, which made evidence against him, the execution of the deed to her by her maiden name for the premises in which she lived, and his leaving New England, and introducing his paramour as his wife in a place where his antecedents were unknown. That paramour was young, fascinating and ambitious. She elicited admiration by the exhibition of her intellectual attainments, and by her grace as hostess in her rich lover's house. Smith was twenty-three years her senior, and greatly her inferior in intellect. His age and mental inferiority enhanced her brilliancy in his eyes. He loved her, and, in his infatuation, abandoned himself to her. It was her ambition to be his wife, or, at least, to appear to be his wife. She had declared to a friend at Lowell that Smith would settle with his wife and get rid of her, and that then she would be married to him in New York, and that his children should not follow them; and the evidence indicates that she exerted all her watchfulness and power to keep those children away. She had no children, and I think the evidence fairly warrants the assumption that she utilized the fact of her medical education to make Smith believe that he lacked the power of procreation. How far she succeeded is best shown by the declarations he made. She seconded Smith in traducing the character of his wife, repeating his assertion that he had never married her, but had gone through the mere form of a marriage ceremony.

The evidence is unquestioned that Smith characterized his wife as a " loose woman," whom he had " kept."

Three interpretations of Smith's declarations may be suggested :

*First.* That which treats them as expressions of his sincere conviction.

*Second.* That which treats them as falsehoods ; and

*Third.* That which treats them as the expressions of a deluded mind.

The first of these interpretations must necessarily be based upon the assumption that he believed, as fact, one or more of the following conditions: *First,* that he was never lawfully married to his wife; *second,* that he was persuaded by the professional advice of Agnes that he did not possess the power of procreation; and, *third,* that he doubted his wife's fidelity to him.

His declaration to Judge Rankin, that he never had, or could have, children, under such assumption, would be attributed to his faith in the advice of Agnes, and his statement to the judge, that "there might be some children" by the loose woman with whom he cohabited, "but he could not tell whether they were his or anybody else's," assuming, as it does, that he may have possessed procreative power, may be attributed to his doubt of his wife's fidelity; while his announcement that he never married Eveline may be attributed to his belief that the Boston ceremony was illegal and his subsequent life with his wife equally so.

His declarations that he had every reason to believe that he never was a father and that he had no children, may have been founded upon his faith in the advice of Agnes. When he said to Hulme that he did not know that the children charged to him were his, but wished he did, and to another witness that he had no children that he knew of, he may have been struggling between doubt of his wife's fidelity and belief in the correctness of Agnes's advice.

It appears to me, however, to be so impossible, under the proofs, that Smith, with his strong common sense, which had made him rich, should make the assumptions upon which this interpretation rests, that, with this mere suggestion, I dismiss it as untenable.

The second interpretation, which treats the declarations as falsehoods, appears to be susceptible of stronger support in reason. Smith was a strong, determined man, with a bountiful supply of common sense and knowledge of human nature, and, although in a measure illiterate, could not easily be conjured

into the belief in the non-existence of that which he knew existed. Agnes might have persuaded him by asserting results of scientific examination, that while he was with her he did not possess the power of procreation, but it was not likely that she could have persuaded him that, in the past, he had not possessed that power. He had closely followed the processes of nature while he cohabited with his wife, and the demonstration of his paternity then brought him conviction, which was not easily lost by a man of his character.

The advice of Agnes had not persuaded him of past inability while he lived at Lowell, for it was there that he told Elton that he was his legitimate son and should not worry. Nor at Smithville, where he again recognized Elton as his son by permitting him to call him "father." It was not until after Elton addressed him in this way, in Agnes's presence, that it was resented, and he branded the boy as a bastard and expressly repudiated his mother forever. Yet, even after that, he recognized some tie between himself and Eugene and Edward by giving them considerable sums of money.

For a moment let me consider the conditions which surrounded him and Agnes. He had made a compact with her to cast off his family. It was of vital importance to her that that compact should be faithfully and fully observed by him. Since their removal to Smithville she had risen, in appearance, at least, from the disgraceful position of paramour to the honorable position of wife. Society looked upon her as virtuous, and held out its arms to her. The door was open to her to enter it as an ornament. She had wealth, and was attractive, respected and admired. To maintain her position, the skeleton that haunted her—Smith's family—must be unknown by her surroundings.

The situation of Smith was little different. He had introduced his brilliant paramour as his wife in a new community, where he had invested his estate and had become respected. He loved that paramour with all the passion of his strong nature, and, for the sake of that love, had basely severed all the natural ties to his past life by a cruel and unmanly abandonment of his lawful wife and family. He coldly calculated and willed this,

course. The case abounds in proof that it was the pride of his strong nature to accomplish his purposes, at whatever cost.

Then, as he rose in public estimation, he was made a director of the principal bank in the community in which he lived, and of the Burlington County railroad, and he became ambitious to hold office of dignity, power and honor. If it should be known that he was morally corrupt, and that he had basely abandoned his wife and family, it would be impossible to gratify his ambition. The moral sentiment of the community in which he lived would never knowingly have tolerated the selection of such a man as its representative.

When he had secured honors through continual and emphatic denials of baseness and immorality, it was not likely that true manhood and honesty would prevail upon him to denounce himself and his paramour as impostors and liars. He had embarked upon a course from which he could not turn without absolute ruin. If, after the death of Agnes, he paused to consider it, it is evident he chose to continue in it, and to further raise himself in public estimation by posing as a philanthropist. That he might, while he lived, enjoy the encomiums that his purpose would draw from his friends and neighbors, he loudly declared it, taking care at the same time to anticipate the alloy of apprehension of suspicion of unfulfilled duty by repeated denial of that duty.

I am constrained to believe that this is a just estimate of the characters of Agnes and Smith and their environments. The testimony abounds in trifling proofs, which, as a whole, have convinced me of its truth; and when I examine the declarations now under consideration, that conviction becomes abiding and strong.

It is not safe to implicitly rely upon the language of Smith's declarations, as it is given by the witnesses. They speak after a great lapse of time, when the words used are apt to be forgotten, and only the idea, which the witness must clothe in language, is carried in the memory. I do not mean that language cannot be remembered, but that when, after the lapse of years, a witness attempts to give it, his testimony is apt to be

unconsciously given, in the light of the emergency which calls
it forth, and under the influence of his sympathies or interests,
creating conditions under which qualifying expressions may be
forgotten. Such testimony should, at least, be critically and
suspiciously examined. *Jones* v. *Knauss, 4 Stew. Eq. 409, 416.*
We have in this case, however, language which accurately states
Smith's denials in the shape of the card that was published in
the "Mount Holly Herald," and I judge, from the testimony
of the various witnesses, that it is an epitome of all his denials.
In it he first denounced as "utterly false" the story that he had
a wife and family at Woodstock. Then he proceeded to deny
in detail, first that he ever married Eveline Verona English,
then that he ever pretended that she was his wife, or gave her
reason to suppose she was his wife, and then, that he ever lived
with her as her husband. Then he asserted that he had every
reason to believe that he never was a father. Then he put him-
self in the attitude of a sympathetic benefactor of a fallen girl,
and added that Eveline was never in Lowell or Boston four
hours in her life.

The declaration that he never pretended to marry Eveline
was in direct contradiction of his representation to Allan
Thompson, that she came to him in trouble, and that he took
her to Charlestown and had a friend marry them, and his
repeated statements to Levi Houston, both at Lowell and Smith-
ville, that he had taken her to Boston and pretended to marry
her, and was out of harmony with the assertion of Agnes
Gilkerson, that Eveline supposed herself to be married at
Boston.

The denial that he ever lived with her as her husband, is
refuted by a mass of testimony which constitutes nearly half
the volume of the case. In the multitude of proofs of such
cohabitation are the prominent facts, that he habitually ad-
dressed his letters to "Mrs. E. V. Smith;" that he concluded
at least one of the letters that were preserved from his destruc-
tive hand, with the words, "Your affectionate husband;" that
one of Eveline's children was born in his own brother's house
as his child, and that his own sister attended Eveline in her con-

finement at the birth of another child; that at Woodstock he tossed one of her children in his arms, exclaiming, " Papa's boy, papa's boy ; " that he was accustomed to gather her children about him and hear them call him " father " and Eveline " mother ; " that he knew of and acquiesced in his neighbors' recognition of Evaline as his wife, and that, as late as April, 1865, while he was preparing to abandon her, he joined with her in a solemn deed, in which she was represented as his wife. That the memory of Eveline and his connection with her were not obliterated from his memory, is evidenced by his recognition of her to those who knew her not as an abandoned woman of shame who had craved and had his sympathetic assistance, and his attempt to meet her in New York, when he ran for congress in 1878, and buy her silence.

Then follows the announcement that Eveline was never, to his knowledge, in Lowell or Boston four hours ; a statement which I do not understand, but which was probably disingenuously calculated to meet some inaccurate statement in the attacks upon him.

Coupled with all this falsity is the declaration that he had every reason to believe that he never had been the father of a child. Was it, too, a falsehood? From its surroundings, buried in falsehoods, it does not address itself to me either as honest belief, springing from the medical testimony of Agnes, or as delusion.

From this point I feel constrained to discuss the question whether the declarations were falsehoods or the product of a delusion, and I bear in mind, as I proceed, that delusion is that which springs spontaneously into the mind in absolute independence of the processes of reason.

It is remembered that Smith told Judge Rankin that he never could have a child—it was impossible—but that at the same time, as he explained his relations with Eveline, apparently forgetful of his declared inability to procreate, he doubted whether the children were his, not on the ground of any physical incapacity in him, but on the ground that the woman who bore them may not have kept herself to him alone. The doubt

thus expressed exhibited a belief in his power to procreate, and
a condition of mind utterly inconsistent with the idea that the
delusion claimed existed.

It was about the time when the card was published in the
"Mount Holly Herald" that Smith rode with the witness
Hulme, and said that he had children charged to him, but was
in doubt whether they were his, and it was a year or two later
that he used to Mary Bishop the expression pregnant with
doubt, "If I ever was a father, I never knew it."

While he entertained such doubts he said to others, and pub-
lished under his hand, that he had reason to believe that he had
no children and was unable to procreate. This statement, when
analyzed, is perceived not to be a denial of the existence of a
fact, but the assertion of a mental process which was leading
him to a conclusion. It was that he had reason which led
towards belief of a fact. Now, at the time he used this expres-
sion to some persons, he was suggesting doubts of his wife's
virtue to others, and was absolutely denying paternity and pro-
creative ability to still others. Did delusion exist? Can it
exist in doubt or in a process of reason? Would it not show
itself in a constant positiveness, which must accompany certainty
as to fact? His declarations were of three kinds: those in
which he absolutely denied ability to procreate; those in which
he affirmed that he had reason to believe he could not procreate,
and those in which he impliedly admitted power to procreate by
doubting his paternity of indicated children, through lack of
confidence in the fidelity of his wife; and they were not used in
an order which evinces gradual conviction or conclusion, but
irregularly, as if adapted to the several characters to whom they
were addressed, or the provocation to which he was, for the
moment, subjected. His use of them indicates, to my mind,
evil purpose, rather than honest doubt or delusion. And, I
think, there may be detected in his declarations an under-cur-
rent of effort to appease his conscience by attempts to conjure up
belief that his wife was unfaithful, or that the professional
opinion of Agnes was correct, in a struggle to found a belief
upon evidence that he knew was insufficient. But I am satisfied

that he never accepted the fact, either as the product of evidence or delusion.

His wretched mental condition when Agnes died, and as he reflected that the love for which he had given so much was gone, and that he must from thence alone continue his false life, is well expressed by his entry in his diary : " Don't expect any more happiness in this world. Have prepared myself for misery by a long period of happiness."

I think that the respondents have failed to establish that Mr. Smith labored under delusion.

I have very little trouble with the question of undue influence.

The paper here disputed was made more than five years after the death of Agnes Gilkerson. That it was in accordance with her wish can hardly be denied. To Judge Rankin Smith said that Agnes wished it so, and to Allan Thompson he said that he had made a will for the benefit of the rising generation, as she requested. But did that wish or request amount to moral or physical coercion ? If it had never been expressed or made, would he have made such a will? How did he stand with reference to the disposition of his property ?' He had denied his wife and children. Could he leave his property to them ?' To do so would unveil his true character to the world. His base and deceptive life would have been revealed, and the memory of him who had had wealth, power, honor and dignity would, when he died, be blackened, and the amends, at so great cost, would come too late to secure for him even the gratitude of his children.

The visit and speech of Alexander H. Stephens probably suggested a charity to which Agnes gave shape when she perceived that she could not live to take under the will that had been made in her favor. She could perceive that, for the preservation of her own and Smith's memory, it was necessary that a will should be made, and also that it should ignore the abandoned wife and children. I doubt not that a charitable disposition of the property was her wish. But when it is remembered that after her death Smith took interest in the world,

continued in public life, serving in the state senate, and repeatedly denying his wife and children, and immersing himself in the cares of a large and prosperous business, it is difficult to believe that her influence so dominated that, but for it, he would not have made the will in question.    That her wish was remembered and respected cannot be doubted.    But in view of the fact that it affords the only means of safety to the reputation he would leave at his death, it becomes apparent that it must have so addressed itself to his self-interest that he needed no domination to coerce his acceptance of it.

In proof of undue influence, we have literally no evidence except the declarations of Smith above indicated, and they merely open the door to conjecture.    The great lapse of time between the death of Agnes and the execution of this will makes strongly against everything suggestive of inference or presumption, and in favor of my conviction that the disputed paper was the product of Smith's own will.    I doubt not that when he made it he had his wife and children before his mind, only to be thrown aside as the penalty for their recognition appeared.

I have thus failed to reach the conclusion of the orphans court, that this inofficious will should be denied probate.    Such a conclusion would have accorded with my sympathy for the forsaken wife and children, and that which I conceive to be righteous indignation at the injustice they have suffered, but my strong conviction, that Smith possessed testamentary capacity and was free from undue influence, must control my judicial action.    It is my duty to protect him in the right which the law gives him.

The right of dominion over property is not a natural one. It is a product of social compact, bestowed as a reward for the virtues or superiority by which the property was produced or acquired.    When man dies, the property which he has accumulated must remain behind him.    He possesses no natural right to transmit it to persons of his selection.    Under natural law, at his death, it would go to the strong, and those to whom he would give it might never take.    Here again the social compact pledges itself to enforce his disposition of it.    The only requisites to this

·enforcement (in this state) are, that he shall observe specified formalities, be of certain age and possess mental capacity. His power of disposition is absolute. Possessing capacity he may give to whom he pleases. This power is a weapon to the weak and the old, who, without it, might be despised and neglected. The courts cannot reject a will because it does not comport with their ideas of propriety and justice, or even because it appears to be unreasonable, unjust, injudicious or cruel. If a testator observes the requirements of the law, and possesses capacity, he may lawfully make an unjust will. In the case of *Den.* v. *Gibbons, 2 Zab. 117, 141*, Chief-Justice Green used this language: "If this will be invalid, no virtue of the testator can sustain it, if valid, no vices of the testator can impair it. Much less can the validity of this will depend upon the consistency of its provisions with our ideas of fairness or propriety, or even with the principles of justice and humanity; such a test of its validity would be certainly subservive of an absolute control and dominion which the law gives to every man over his own property. The question for your decision is not, is this a fair will, a just will, an equitable will, the will of a right-thinking man and a kind-hearted father, but is it Thomas Gibbons's will? If it is, your verdict should be for the defendant."

In *Boylan* ads. *Meeker*, Chief-Justice Whelpley said: "That the will to others, not having the means of knowing what the testator knows, not occupying his standpoint, not having lived his life, not having his secret affections and hates, may seem unreasonable, injudicious and even unjust, is no reason why it should be declared the product of a diseased mind. A testator has a right to make an unreasonable, unjust, injudicious will, and his neighbors have no right, sitting as a jury, to alter the disposition of his property, simply because they may think the testator did not do justice to his family connections."

In *Middleditch* v. *Williams, 18 Stew. Eq. 726*, Vice-Chancellor Van Fleet said: "A will may be contrary to the principles of justice and humanity, its provisions may be shockingly unnatural and extremly unjust, nevertheless, if it appears to have been made by a person of sufficient age to be competent to make a

will, and also to be the free and unconstrained product of a sound mind, the courts are bound to uphold it. The courts must so treat papers of this kind in order to maintain that great principle which confers upon every citizen of full age and sound mind the right to do with his own as he pleases, so long as he does not attempt to apply his property to an immoral and unlawful purpose."

I will reverse the decree below and admit the will to probate. The costs of both the appellants and respondents, including reasonable counsel fees, to be fixed hereafter, will be decreed to be paid out of the estate.