In the matter of the probate of a paper purporting to be the last will of GEORGE P. GORDON, deceased.

1. Where a personal property, belonging to a testator's estate, is within this state to be administered, the will may be proved here, though the testator, at his death, was domiciled in another state and the will has not been proved there.

2. The correctness of the opinion of an expert in handwriting is usually susceptible of ocular demonstration, and it should be accorded as of little evidential weight when it is not accompanied by such demonstration.

3. The declarations of an alleged testator upon the issue forgery *vel non*, which make for or against the disputed paper, are not admissible in evidence.

The paper in dispute was presented for probate in common form to the ordinary on the 17th day of January, 1891, by Adeline J. Gordon, a sister of the decedent.   It was then made to appear that the widow and daughter of George P. Gordon were dead and that each of them had died without issue; that George P. Gordon, at his death, was domiciled in Woodbridge township, in the county of Middlesex; that no caveat had been filed in the surrogate's office of that county against the probate of such a will, and that it would be exceedingly difficult, if not impossible, to ascertain what interests would be affected by the probate desired, and hence what persons should be notified of the proceeding for it.   The application was urged in behalf of the next of kin and heirs at law of George P. Gordon, all of whom were favorable to it.   Under the circumstances, it was considered expedient to permit probate in common form in the first instance, and if contest should arise, to thereafter require solemn proof upon such notice to parties in interest as might then appear to be practicable and proper, and accordingly the will was admitted to probate and, the executors named in it being dead, Adeline J. Gordon and William H. Corbin were appointed administrators *cum testamento annexo* upon their duly giving bond.   The practice contemplated is referred to in *Straub's Case, 4 Dick. Ch. Rep. 265,* in this language : " There are two methods of obtaining probate known to the practice of the English ecclesiastical courts—one in common form and the other in solemn form or *per testes.*   The proof is said to be in common form when the executor presents the will for probate in absence of the parties in interest (to be affected by the probate) and, without citing them, proceeds *ex parte* with his proof, and it is said to be in solemn form when those in interest are cited to be present at the probation or approbation of the will.   When a will is proved in common form, the court, at any time within thirty years after probate, may require the executor of its own motion or at the instance of the next of kin or other persons interested, to prove the will in solemn form."

On the 13th of February, in the same year, Henry J. Cullen, junior, petitioned the ordinary for reproof of the will, representing that he was interested because, as public administrator of the

county of Kings, in the State of New York, in which the city of Brooklyn is situate, he had administered upon the estate of George P. Gordon and made distribution of it as though Mr. Gordon had died intestate. Subsequently the executor of the will of the widow of Mr. Gordon and two persons, Pauline Theresa Reitz and Richard Ruyssenaers, who are named as the principal legatees in a paper purporting to be the will of the daughter of Mr. Gordon, the validity of which paper is in dispute, made similar application. Whereupon the ordinary directed the administrators *cum testamento annexo* to make proof of the disputed will of George P. Gordon in solemn form, after first giving notice to all persons in interest, most of whom resided without this state and possibly many of whom were and are unknown, by publication for a prescribed time.

Upon the day fixed for hearing, Adeline J. Gordon, a sister, and A. Sidney Doane, a grand-nephew, of George P. Gordon, appeared as proponents of the will and William W. Old, the executor of the will of Lenore M. Van Wyck, who had been the widow of George P. Gordon, and Pauline Theresa Reitz and Samuel Richard Ruyssenaers appeared to resist probate.

*Mr. Gilbert Collins*, for the proponents.

*Mr. Barker Gummere*, with whom was *Mr. Theodore F. Miller* (of the New York bar), for the objectors.

THE ORDINARY.

The probate of the paper in dispute is resisted upon two contentions—*first,* that the domicil of George P. Gordon, at his death, was in Brooklyn, in the State of New York, and for that reason that this court cannot, even if the paper be the will of George P. Gordon, admit it to probate, and, *second,* that the paper is a forgery and not the will of George P. Gordon.

I have no difficulty in disposing of the first of these grounds of contest. It abundantly appears, if this will be valid, that there is personal property belonging to the testator's estate within the jurisdiction of this court which must be administered under

the will. This being the fact, it is fully established that the will may be proved in this state, even though the testator, at his death, were domiciled elsewhere and the will has not yet been proved at the place of domicil. *Stevens* v. *Gaylor, 11 Mass. 255, 263 ; Varnar* v. *Bevil, 17 Ala. 286 ; Hyman* v. *Gaskins, 5 Ired. 267 ; Jaques* v. *Horton, 76 Ala. 238 ; Woods* v. *Matthews, 73 Mo. 477, 483.*

Question as to the domicil of Mr. Gordon, although urged on both sides at the argument, does not appear to me to be necessarily in issue at this time. So far as personalty is concerned, the law of the domicil would determine the capacity of the testator to make a will and, as well, the formalities to be observed in the execution of the will, but as there has been no contest upon either of these points I am not called upon to say what law shall control them, and therefore what the testator's domicil was. The competency of evidence belongs to the law of the place of trial, and hence rulings upon its admission or rejection do not raise the question of domicil. It would, therefore, be a work of supererogation and of little value for me at this time to determine this disputed question of fact.

The second branch of the case presents the principal question at issue. Is the paper offered for probate the genuine will of George P. Gordon ?

That the discussion of this question may be fully understood and appreciated, it is necessary to shortly state something of the history of the principal characters with which it will deal.

George P. Gordon, the alleged testator, was born in Salem, New Hampshire, in 1810. In early life he was a printer by trade. In 1846 he married Sarah Cornish, by whom, in 1847 or 1849, he had his only child, Mary Agnes, who survived him until May, 1890. After this marriage he invented a printing press, which proved so profitable to him that he rapidly amassed a considerable fortune. It does not appear when his first wife died, but it is shown that in 1856 he married Lenore May, who survived him and afterwards became the wife of Henry Dubois Van Wyck, who had been a friend of Mr. Gordon and a constant visitor at his house. This second wife died, after Mr.

Gordon's Case.

Gordon's death, in December, 1890, at Norfolk, Virginia, where she then lived with her second husband.

Prior to 1866, Mr. Gordon lived in Brooklyn. In that year he purchased a place in Woodbridge township, in the county of Middlesex, to which he removed with his wife and daughter. From Woodbridge he daily went to his place of business in the city of New York, at which he sold his printing presses. Until 1872 those presses were made for him by the firm of Nichols & Langworthy, of Hope Valley, Rhode Island. In 1872 he erected a factory at Rahway, in this state, about two miles from his residence, at which he thereafter manufactured presses himself and of which he died seized and possessed. That factory still exists in operation as part of his estate, if the paper in dispute be valid. In 1869 he purchased land near the city of Norfolk, in the State of Virginia, which he put in charge of Henry Dubois Van Wyck, and upon which he maintained another residence which he and his wife occasionally visited. In 1874 he bought a house known as 155 Columbia Heights, in the city of Brooklyn, and furnished it as a residence. To this house his daughter, who did not live on amicable terms with her stepmother, moved and became its mistress. Mrs. Gordon remained at the house in Woodbridge township as its mistress. It was Mr. Gordon's custom to occasionally stay with his daughter at the house on Columbia Heights, and, from that fact and his conduct there, together with his former residence in Brooklyn, springs the contention that his domicil, at death, was in Brooklyn. In January, 1878, he died at Norfolk, Virginia. His body was brought to Brooklyn and buried in Greenwood cemetery in or near that city. He left the following immediate kindred surviving him : His sister, Mary Ann Doane, who died in 1887 (this sister had a son, A. Sidney Doane, since deceased, who was Mr. Gordon's confidential clerk and assistant), and a grandnephew, another A. Sidney Doane, who is now one of the proponents of the paper here in dispute; also a brother, Cuthbert Collingwood Gordon, a Universalist minister, who died in 1883, leaving two sons— one, Henry, who is yet alive, and the other, Cuthbert, who died in 1886. I refer to the latter son because of his connection with

26

this case, which will hereafter appear; also two other sisters, Wealthy Jane Bogert and Adeline J. Gordon, both of whom still survive.

The paper in dispute is said to have been drawn and executed at the house of Henry Adams, in Woodbridge township. It purports to have been witnessed by Henry Adams and his two sons, Alonzo C. P. Adams and John Q. Adams, all of whom died in the year 1875. The draughtsman of the instrument was Henry C. Adams, also a son of Henry Adams, who testifies that he superintended its execution. So far as appears, Henry C. Adams is the only living person who ever had any connection with or knowledge of the paper in dispute.

. Henry Adams and his son Henry C. were both lawyers at Fort Plains, Montgomery county, New York. Prior to 1868, Henry Adams, being possessed of a modest fortune, retired from the practice of his profession and removed to this state, where he purchased a small farm of about sixty-five acres in Woodbridge township, and erected upon it a dwelling which was his residence for the remainder of his life. He had four sons, the three already mentioned and Edward L. Adams, who is now upwards of fifty years of age, and has been in actual possession of his father's farm at Woodbridge since 1886. Prior to the last-named year, for a time not disclosed, he was in the west. What his occupation there was does not appear. It is shown that during his absence the farm was occupied by a tenant. It does not now appear what business Edward L. pursues, but I gather that he is a farmer and also a performer upon some musical instrument in a band.

. In 1868, Henry C. Adams, being then about fifty years of age, gave up the practice of his profession at Fort Plains and went to his father's house at Woodbridge, where he met George P. Gordon, whose residence adjoined the father's farm. He had very little property, not sufficient to justify his permanent retirement from remunerative employment. His explanation is that he gave up his law practice because he conceived the purpose of compiling a glossary of legal terms and publishing it; that he is a bachelor of frugal habits, and that his means from that which

he earned in the practice of his profession and from that which he has had from his father's estate have been sufficient to supply his few wants while he has worked upon his book near the large libraries in the city of New York. As the fruit of his labor for the last quarter of a century, he produces a volume of his glossary, stating that the whole work, to consist of three volumes, is finished, but not yet published. He explains that he and Mr. Gordon both had some musical taste and played on the flute, and that their common taste and accomplishment brought them into friendly relations in the summer of 1868, while he was at his father's house; also that an incident cemented a friendship between them. Mr. Gordon occasionally used intoxicating liquors to excess, after which he would frequently suffer from extreme nervous prostration and inability to sleep, and that, upon an occasion of this kind, during the summer of 1868, he (Adams) had prepared a sleeping potion which proved effective where other remedies, prescribed by a physician, had failed, and that thus he won Mr. Gordon's ardent gratitude and friendship.

After Mr. Gordon's death in 1878, a will was found among his papers which was signed by him and bore date on the 26th day of July, 1873. It declared him to be of Woodbridge township; gave his widow $100,000 in lieu of dower; put $100,000 in trust for his daughter's use for her life, the principal to be divided among her issue at her death; gave $10,000 to each of his sisters, Wealthy Jane Bogert and Adeline J. Gordon; gave $10,000, together with one-fourth of the patents for his printing presses and one-fourth of the profits of the manufacture and sale of such presses, to his nephew, A. Sidney Doane; provided legacies of $3,000 each for the five remaining children of his sister Mary A. Doane, the three children of his brother Cuthbert, and the two children of his sister Mrs. Bogert; gave general legacies, also, to relatives of his deceased wife; and to his brother Cuthbert, if living at his death, gave one-fourth of the patents for his printing presses and one-fourth of the profits from the manufacture and sale of such presses. The residue of his estate was put in trust for the benefit of his wife and daughter for their lives and their issue after their deaths. Henry Dubois

Van Wyck and, the nephew, A. Sidney Doane, were made ex-- ecutors of the will.

This will was offered for probate in Brooklyn, but was refused probate because, among other things, it was shown that the witnesses to it had not signed in the presence of each other. There, however, is no doubt that the document expressed the testator's testamentary intention at the time it was made.

After probate of that instrument had been refused, some time in the year 1879, Henry C. Adams called upon A. Sidney Doane and told him that Mr. Gordon had made a will in 1868, which might be found or, if lost, established by means of a draft of it which he, Adams, had retained. Mr. Doane refused to act upon this proposition. Then Mr. Adams presented the matter to Cuthbert O. Gordon, the brother of George P. Gordon, who also refused to enter into the controversy that the proposition suggested, giving as his excuse, according to the testimony of Henry C. Adams, that his health was too frail, and that his niece, Mary Gordon, made fair promises with reference to the disposition of his brother's property. Adams then wrote to Cuthbert Gordon, junior, cautioning him to say nothing to any one, but to come and see him. Mr. Adams says that his purpose in so writing was to bring this young man to him and tell him the history of the paper now in dispute and show him the draft of it, of which he had retained possession. In answer to Mr. Adams's letter, Cuthbert wrote that he had spoken to his father, and that they desired to know what Mr. Adams wanted. Upon receipt of this reply, Adams ceased all effort to interest the Gordon family in the paper in dispute. He did not communicate at all upon the subject with either the widow or daughter of George Gordon, or with any of the officials or other persons who dealt with Mr. Gordon's estate.

It was not until the year 1890 that Adams again mentioned the disputed paper, and then, noticing, as he says, an account in a newspaper of the contest over the alleged will of Mary Agnes Gordon, before the surrogate of Brooklyn, he wrote to Messrs. Black & King, a firm of lawyers, who represented the contestants in that suit, that he would give them some information

worth knowing if they would call upon him. He was then living at Orange. His letter to Messrs. Black & King was as follows:

*"Private and confidential.*

"ORANGE, N. J., Oct. 17.

"DEAR SIR—I this day read an article in the Telegram of Wednesday *"Battling for a Fortune."* It astounds me and grieves me too that such cruel injustice has been done.

"If one of you will come over here on Sunday morning Chamber Street Ferry, Erie Depot 9.20 A. M., bringing no brass band, fife or drums, I will tell you something worth knowing.

"Yours truly,

"H. C. ADAMS."

After some misunderstanding as to the place of meeting, Mr. David B. King, of the firm of Black & King, called upon Mr. Adams, and was informed by him that Mr. Gordon had executed a will in 1868, which he, Adams, had drawn at Gordon's instance, and that he, Adams, had retained a corrected draft from which the will itself had been copied. He produced a paper which he said was that draft and permitted Mr. King to copy it. He also told Mr. King that the original will, after its execution, had been left with his father, and that it must then be at his father's homestead, in Woodbridge township, where he would try to find it.

Mr. Adams testifies that late in October or early in November of the same year he visited Woodbridge, and, without saying anything about the disputed paper to his brother Edward, who lived in the homestead, by himself alone, took a survey of the premises, and then requested Edward to search the house. He gives this as his language to Edward:

"Now you have possession of the premises, of all the house; you make a search of that house from cellar to garret so that you can testify in court that you have made the search and cannot find it, in order that they may establish that will of 1868, as a lost will."

He says that he remembered that the will had been put in a reddish brown wrapper sealed with wafers, and that he so told his brother. After a few days he received a postal card from

Edward, which informed him that the paper had been found.
Thereupon, on the 21st of November, he wrote to Messrs. Black
& King that his brother said that he had found the will. On
the outside of the envelope in which he sent this letter he en-
dorsed the word "*Eureka.*" The next day, with two lawyers, he
went to Rahway and identified the package found by Edward as
that which contained the will, although it was not then opened
and was not endorsed in any way to indicate the character of its
contents, and he had not seen it, if he is to be believed, for more
than twenty-two years.

The package remained in possession of Edward Adams for a
few days and then was taken to a safe deposit company, where it
remained until it was delivered, unopened, to the ordinary, at
the time the paper it contained was offered for probate. In the
meantime the draft of the alleged will which Henry C. Adams
had produced was deposited with the secretary of state for safe-
keeping.

The disputed paper is written upon blue legal cap, while the
draft is upon white legal cap. Both papers are written with
black ink. There are many interlineations in the draft, all of
which, with but one or two exceptions, I believe, are written with
red ink. The disputed paper is long and complicated, but, shortly
stated, makes this disposition of the testator's estate :

It recites that Mr. Gordon expects to purchase a farm from one
Laing (this purchase was, in fact, afterwards made), and it devises
that farm to the testator's wife, and directs that the executors
shall erect thereon designated buildings, at the cost of $15,000.
It also provides for furnishing the dwelling to be erected and
gives the widow an annuity of $1,200, all of which she is to take
in lieu of her dower.

It gives to Elizabeth May, the widow's sister, $5,000, together
with an annuity of $100. It gives the testator's homestead to
his daughter for life, and, if she shall marry, to her and her hus-
band in fee as joint tenants, and also gives to the daughter an
annuity of $3,000 for her life, and to her husband, if she marry,
$2,000 a year for his life, and makes provision for their issue.
If the daughter marry, she and her husband are to have one-

fourth of the printing press patents and one-fourth of the profits
from the sale and manufacture thereunder.　The testator's brother,
Cuthbert Gordon, is given one-fourth of the patents and the
profits of manufacture thereunder, to which gift is added this,
which has much prominence in the present inquiry:

"I now am seeking and I expect to purchase of my neighbor Henry Adams
Esq., his farm upon which he now resides, formerly known as the '*Thomas
Morris farm*' of about sixty-five acres, lying opposite to and on the southerly
side of my farm which I have offered four hundred dollars per acre, or say
twenty-five thousand dollars, and adding thereto the cost of the new dwelling
and improvements now erected and made, which I estimate at eight thousand
dollars, making in all for said farm and its appurtenances the sum of thirty-
two thousand dollars.　If the said farm shall not have been purchased by me
before my death, then I order and direct my said executors to keep my said
offer of thirty-two thousand dollars to Mr. Adams or his grantees or assigns,
for said farm and appurtenances and if the same shall be accepted by said
Adams, his grantees or assigns, I order and direct said executors to pay to said
Adams his grantees or assigns the said sum of thirty-two thousand dollars for
said farm, and I order and direct that the deed for the same shall be made
from said Adams his grantees and assigns to and in the name of my brother
Cuthbert C. Gordon, Cuthbert O., Henry and Lucrecia (or the survivors or sur-
vivor of them) jointly and to the survivors or survivor of them in fee simple
absolute."

Provision is then made, that if the Adams property shall be
purchased for $32,000, that a piece of land called the "*Compton
lot*" shall also go to his brother Cuthbert C. and Cuthbert's wife
and children, together with $10,000 to be expended in the im-
provement of the Adams property.　But, if the executors should
fail to secure the conveyance of the Adams property for the price
of $32,000, then the devise of the Compton lot and the bequest
of $10,000 should be void.

It is perceived, at this point, that the failure to purchase the
Adams farm at the price of $32,000—a lower price does not ap-
pear to have been contemplated—will reduce the taking of Cuth-
bert C. Gordon and his wife and children in his brother's estate,
by the sum of the value of the Adams farm and the Compton
lot and the $10,000.　As will presently appear, Cuthbert C.
Gordon is an executor of the will.

The will next provides for A. Sidney Doane, who is also one of the executors. He is to have one-fourth of the patents and of the profits of manufacture thereunder and, if the testator's widow shall elect not to take the provision for her in lieu of dower, the Laing property and $12,000 to improve it, and, if the widow accept the provisions of the will, $10,000 in cash. Provision is then made for the purchase of a factory site, in case the testator shall not in his lifetime buy one, at the price of $350 per acre.

One-eighth of the patents and of the profits of manufacture thereunder, together with $6,000, is given to Wealthy Jane Bogert, a sister; $10,000 is given to Adeline J. Gordon, another sister, and one-eighth of the patents and profits thereunder, with $10,000, is given to Mary Ann Doane, another sister, but all the cash payments here contemplated for the sisters are directed to be postponed until, among other things, the Adams farm shall be purchased.

The residue of the estate is put in trust in the executors to pay one-fourth of the income to the testator's daughter, one-fourth to his brother Cuthbert, one-fourth to his nephew, A. Sidney Doane, and one-eighth each to his sisters, Mrs. Bogert and Mrs. Doane. The paper then contains a provision that if the executors shall not have enough money to pay the entire purchase-money for the Adams property and the factory site, they may pay one-third of the price and secure the payment of the remainder by bond secured by mortgage upon the purchased property. To this provision he adds this language:

"and I hereby order and direct that my entire estate, both real and personal owned by me at my deceased, shall stand pledged as a security and be liable for the payment of such bond or bonds or either of them, with lawful interest upon the same."

Cuthbert C. Gordon, A. Sidney Doane and Charles Beebe, are named as executors. The latter was engaged to be married to Mary Agnes Gordon during the year 1868, but his engagement was broken in 1870.

The disputed paper bears date in July, 1868.

In connection with this statement of the contents of the dis-
·puted paper these facts are to be noted : That in the year 1872
the testator erected a factory at Rahway, and hence the direction
·for the purchase of a factory site is without effect, and also that,
in the year 1874, Henry Adams conveyed his farm to trustees,
in voluntary settlement for the benefit of his children, and hence
·that the language of the will, which describes the persons from
·whom the purchase of the farm is to be made as "grantees and
assigns," although it purports to have been made in 1868, six
years before the settlement by Mr. Adams, is peculiarly appro-
priate to the present condition of the title of the farm.   This
language would not have been apt if the trust deed had not been
made and the title had descended to heirs at law.   It is also to
be here noted that the Adams farm is now scarcely worth one-
third the price for which it is directed to be purchased.   It is
true that in the year 1868 it was worth a higher sum, possibly
two-thirds of the value placed upon it in the disputed paper, and
it is also true that to accomplish his wishes Mr. Gordon had paid
about that time exorbitant prices for property adjoining his resi-
dence fully equal to the price designated in the disputed paper
for the Adams farm.

The only living person who professes to have had knowledge
·of this disputed paper prior to November, 1890, is Henry C.
Adams.   His brother Edward L. frankly states that prior to
that time he had never heard of the existence of such a document.
·Cuthbert C. Gordon and A. Sidney Doane, who were approached
by Henry C. Adams in 1879, are both dead and, as has been
seen, all the witnesses to the instrument itself died in 1875, and
·even George W. Thorne, the draughtsman of the later will of
1873, who, it is suggested, adopted language from it for the will
he drew, is dead and was dead when Henry C. Adams first ap-
·proached any one upon the subject of this paper.

Under these circumstances, the establishment of the document
must depend upon the credit which is to be given to the testi-
·mony of Henry C. Adams, the proof of the signature of the
·testator and the subscribing witnesses by that testimony and by
·comparison with their admittedly genuine writings, and the in-

herent evidence, which the terms of the disputed paper themselves may afford. All of these matters are seriously disputed.

Henry C. Adams most clearly and positively testified that he drew the disputed paper at the instance of Mr. Gordon. He produced a draft from which he said it was copied and he narrated with wonderful memory of most particular details how it was executed in exact conformity to law. If his testimony be true there can be no question as to the genuineness of the paper offered for probate.

Against credence of his testimony it is urged, in the first place, that he had a pecuniary motive in fabricating such a will as the paper offered, in pursuance of a scheme to secure the sale of his father's homestead for an exorbitant price. This subject is so involved in the structure of the disputed paper that, as I dealt with it, I am constrained for brevity to deal also with the inquiry as to the inherent evidence which the terms of that paper afford of its validity. In direct terms the will required the executors to purchase the Adams farm at the fixed price of $32,000. Those executors were Cuthbert C. Gordon, A. Sidney Doane and Charles Beebe. Cuthbert C. Gordon was given a fixed pecuniary interest in the probate of the disputed paper and also a particular interest in the purchase of the Adams farm. If the paper should not be admitted to probate he would lose one-fourth of the patents and the profits under them and one-fourth of the income from the residuary estate and a considerable additional fortune contingent upon the purchase of the Adams farm, and, as has been already seen, if the executors failed to make the purchase of the Adams farm after probate, he and his family would lose about $40,000 worth of property. A. Sidney Doane was bound to the will by similar interest in the patents and residue, a liberal provision for his mother, and an additional benefaction to himself, which, in any event, would not be less than $10,000. Neither of those executors would take a dollar if the testator should die intestate. Charles Beebe had been engaged to marry Mary Gordon, but he pre-deceased the testator. He was interested, but not so strongly, in the will, if he should marry the testator's daughter, by annuity and joint interest with his wife,

but as he died before the testator and before the time when it is probable that the forgery of a will would have been undertaken, and was living at the time when the will bears date, standing in relation of prospective son-in-law to the testator, his executorship at first appearance becomes rather a badge of the genuineness of the document than the reverse. When, however, it is remembered that Henry C. Adams appears by the proofs to be a shrewd and able lawyer, with keen insight to human nature and many years of experience in contemplating and weighing the value of evidence, I quite agree with the insistment of counsel that his acts must be scrutinized and criticised in the light of his ability and upon the intellectual plane upon which that ability will probably put them, so that the most cunning devices consistent with probabilities may be attributed to him if credit is given to the theory of his moral obliquity. It is also to be remembered that the document bears date in July, 1868. If it be a forgery, and Henry C. Adams be the forger, it is not strained and unnatural to expect that the instrument will bear ear-marks of its date. Just such ear-marks as the introduction in the will of Beebe, the prospective husband of Mr. Gordon's daughter, his executorship and the provision for the purchase of a factory site, which was shortly after that date made by Gordon himself, would be. Each of those ear-marks, while affording the assistance to be had from specious appearance, in fact does not erect an obstacle to the accomplishment of the draughtsman's purpose. There was no need to strain the will to conciliate the executor and prospective son-in-law Beebe, for he was dead, and the amount to be offered for a factory site, to be bought only in case the testator should not himself purchase it, in view of the fact that such contingency could not happen, might safely be placed at any fancy which would serve to countenance and support the price to be given for the Adams property.

The direction for the purchase of the Adams property unquestionably throws the disputed paper open to suspicion and exhibits a possible motive in the draughtsman of it, but standing alone it is not fraught with the emphasis in that direction which the subsequent provision for the purchase of the farm on credit gives it.

There the testator is made to pledge his entire estate for the pay-
ment of his bond.  Why should he pledge his entire estate?
Was his desire to add the Adams property to his landed domain
so great that he was willing to risk his entire fortune, including
the patents which had brought him both fortune and fame, in its
attainment?  To have that farm, not while he lived, but after he
was dead, for his brother's benefit, did he mean to arrest the set-
tlement of his whole estate?  But, further, his sisters' pecuniary
legacies were subjected to the purchase from Adams.  Was he so
anxious to secure that farm for his brother, for whom he had
already amply provided, that he would rob his sisters to do it?
Besides, it is evident that the motive could not have been to en-
rich his brother, for it is noticed that, upon failure of the Adams
purchase, the brother was not to have an equivalent for the
$40,000 worth of property he would lose.  Nothing but that
particular purchase would secure to the brother that small for-
tune.  Thus, it is claimed, a motive for forgery by Henry C.
Adams is shown.

The precise interest of Henry C. Adams in his father's farm
was this: On the 1st of June, 1874, the father made the volun-
tary settlement referred to, conveying his entire estate, real and
personal, to trustees, with power of sale, who were to pay the
net income to his children in specified proportions during their
lives.  The share of Henry C. Adams in the income amounted
to about seventeen per cent. of it.  The trust deed shows that
Henry Adams rated the yearly product of the farm, exclusive of
taxes and repairs, at $500.  It is manifest, upon little calcula-
tion, that the income from $32,000 properly invested would be
much greater than that sum, and that the share of Henry C.
Adams in the increased income would be a little over $200 a
year.  It is impossible to either affirm or deny that such a sum
would be a sufficient motive to induce the crime charged in this
case.  To Henry C. Adams that sum, in all probability, appeared
large—at all events it was all-important to him.  He had no
time to earn money.  He had embarked in a literary enterprise
which required all his time.  In return, after a few years, he saw
in it honor, fame and fortune.  He could not earn money, yet he

Gordon's Case.

must not starve during the intervening years. It cannot be said that an additional annuity of $200 was not a coveted prize.

But, continuing the examination of the disputed paper, an important circumstance is its great similarity in expression to the will of 1873. The latter paper unquestionably was drawn by a lawyer named George W. Thorne, who is now dead. Upon comparing the two papers it is impossible to escape the conclusion that one of them must have been before the draughtsman of the other. The question is, Which was copied from the other? It is noticeable that the paper dated in 1868 is redundant in language, while the paper of 1873 is concise in its terms.

My attention is called to the following expressions in these papers:

| DISPUTED PAPER. | WILL OF 1873. |
| --- | --- |
| " Which said devise, bequest, sum of money and legacy, hereinbefore mentioned are in lieu of dower—all her dower right by the common or statute law." | " Which said sum of money is in lieu of all her right of dower at common law or under the laws of this State." |

It is argued that the expression " by common and statute law " is the exact, intelligent formula of Mr. Adams, which is missed by Thorne, who says, " at common law or under the laws of this State." The authorship of the two expressions is not in doubt. The question is, With whom did the thought they seek to express originate? Did Mr. Thorne depart from the accurate statement of Mr. Adams? or, Did Mr. Adams, pursuing Thorne's idea, make accurate a loose and incorrect statement? It appears to me to be more reasonable to infer that one who stops to think and change would do so to make right that which was wrong rather than to deliberately blunder from right to wrong.

A similar instance is found in the description of the patents by the two draughtsmen. They are as follows:

| DISPUTED PAPER. | WILL OF 1873. |
|---|---|
| "All and every patent or patents granted and issued to me (by the Commissioner of Patents under and by virtue of the Patent Laws of the United States) for improvements in Printing presses or relating thereto and all renewals of the same." | "All and every patent or patents granted to me by the United States for improvements in Printing presses or relating thereto and all renewals of the same." |

Here the difference consists in the fact that the will of 1873 rests alone upon reference to the power which granted the patents, while the disputed paper also sets forth the agency through which that power acted. The formula in the disputed paper more exactly describes the patents. Here I make the observation that I made before. It is more likely that Mr. Adams would build out Thorne's imperfect description than that Thorne would abandon the more exact information which the Adams formula gave him.

Another significant portion of the wills is the introductory declaration. This declaration in the two papers is as follows:

| DISPUTED PAPER. | WILL OF 1873. |
|---|---|
| "I, George P. Gordon, of the Township of Woodbridge, County of Middlesex and State of New Jersey, being of good health and of sound and disposing mind and memory (hereby revoking all former wills by me made) do make, execute, publish and declare this my last will and testament in manner and form following, to wit:" | "In the name of God, Amen, I, George P. Gordon of the Township of Woodbridge, County of Middlesex and State of New Jersey being of sound and disposing mind and memory (hereby revoking all former wills by me made) do make, publish and declare this my last will and testament in manner following, that is to say:" |

It is noted that the formula, "In the name of God, Amen," does not appear in the Adams paper, and that the expressions "of good health" and "and form" in the Adams paper do not appear in Thorne's. Upon reference to the draft from which Mr. Adams said that the disputed paper had been copied, I find the words "and form" interlined in Mr. Adams's handwriting. The words "of good health and" are not interlined. From this fact I am led strongly to the inference that in the mental

Gordon's Case.

process of making the disputed paper Mr. Adams supplied the last-mentioned words as he followed Thorne, and upon reviewing his work thought that the words "and form" should also be added, and thereupon interlined them. Those words were interlined in black ink, not in red, as in case of the other interlineations. Does that fact not indicate that the interlineation was an immediate afterthought of a critical copyist?

In another part of the will of 1873, Mr. Thorne uses this expression, "and hereby direct and empower my said executors." Mr. Adams's paper puts the idea contained more correctly, as follows: "I empower and specially direct my said executors," the power thus being first bestowed and the direction for its use afterwards given. The same observation that I have made in the preceding instances is applicable here. A lawyer whose mind is directed to the right is not apt to deliberately change to incorrect forms of expression. In reviewing another's writing the tendency of his mind is to be critical, and especially would this be the case with such a man as Mr. Adams, who was engaged in preparing a glossary, the very object of which was to exactly define the meaning of terms and words. To such a man it would appear important that the power should be stated before the execution of the power, while such order to the less precise Thorne might seem to be insignificant.

It is observable, also, that in the will of 1873, Mr. Gordon made provision for the relations of his deceased wife, while in the paper in question no reference is made to those persons. The question is asked, Would a forger, with the will of 1873 before him, omit those persons? The testimony of Mr. Adams shows that he was not acquainted with them. He did not know upon what terms the testator stood to them in 1868. It would be disastrous to him if he should leave a substantial legacy to one against whom Mr. Gordon cherished open enmity. Such suggestion exhibits that it would be reckless for him to deal with unknown persons. Nor was it safe for him to make inquiry about them, for they were of no concern to him and his inquiries would seem meddlesome and impertinent, and for that reason attract attention, and might thereafter be proved. In such situa-

tion it appears to be suggested with reason that it was best not:
to deal with such persons at all.

The elaborate character of the will prepared by Mr. Adams,.
the mental processes exhibited by frequent changes and correc-
tions in the draft of it, are urged as evidences that it was a
genuine work, for why, it is asked, would not a forger content
himself with a much simpler and shorter instrument? I think
they are evidences of very careful work which may have been
bestowed either upon a genuine instrument or one which was-
designed to be so plausible as to defy attempts to detect its
fraudulent character. It would have been most unwise for a
forger to have embodied the elaborate instruction, with reference-
to the Adams property, in a short, simple will. Such a provision
would gain undue prominence in companionship with that which
was simple and plain. Its undue development amidst simple-
surroundings would at once have drawn criticism, while if other
parts of the will were made equally elaborate, it, at least, would
not have suspicious prominence.

I am satisfied, after careful comparison of the papers of Thorne
and Adams, that one was before the draughtsman of the other.
Mr. Adams says that he made a draft of his will before the draft
which has been put in evidence, and that Mr. Gordon kept that
first draft; and he also states, when recalled almost at the con-
clusion of the case, that Mr. Gordon had the original or a copy
of the last draft for the purpose of using it in drawing a new
will. If he speaks truly, then it was possible for Thorne to have-
had Adams's work. There is no evidence that Adams had access
to Thorne's will until after Mr. Gordon's death, when it became-
a public record, and if he had access to it, it is hardly possible-
that he would have used it in forging a will while Mr. Gordon
lived, and even more improbable that in using it he would have-
forged an instrument of earlier date than Thorne's. It is not
without significance that during the contest over Thorne's will
Adams failed to mention the disputed paper to any one. It was-
not until after that contest had been settled adversely to the will
of 1873 that Adams sought Sidney Doane and Cuthbert Gordon.
How long afterwards does not appear. It was some time in the

Gordon's Case.

year 1879.  I think the inference is strong that if the paper in dispute was forged, it must have been forged in the year 1879.

Now, it is to be remembered that in 1879 a contract between the collateral kindred of Mr. Gordon and his child and wife had just been concluded, in which a will recognizing those collateral kindred had been rejected.  The intestacy of Mr. Gordon was most advantageous to the wife and child.  The suggestion to them of a will which would require the purchase of the Adams property would not meet with favor.  But a will which would provide liberally for this collateral kindred would supply new sinews of war to them and, even if it should contain direction for a suspicious purchase, would be apt to have their support.  The holy avocation of Cuthbert Gordon might disincline him to resort again to litigation, unless his interest under the will was made so substantial as to excite a cupidity which would overcome his scruples.  Nothing but antagonism could be expected from the child and widow, and, hence, provision for them could be reduced to the minimum that a reasonable man would probably put it at. Indeed, the situation was such that the draughtsman of a spurious will might, with reasonable safety, to some extent, indulge any feelings of hostility that he entertained against either of those women.  It has been shown that Mrs. Gordon disliked Henry C. Adams, and insulted him by shutting the door in his face, and it is in view of this fact, in connection with the above suggestions, that I am urged to consider the meagre provision for her as the out-cropping of Mr. Adams's revenge.  That provision has so attracted attention that the proponents have offered evidence that Mr. Gordon was jealous of Mr. Van Wyck, which the contestants have essayed to rebut by letters of Mr. Gordon, which abound in expressions of endearment and devotion to his wife.  It is said that of this situation Mr. Adams took advantage by producing the disputed paper.  It is claimed that the provisions of the paper accord with this theory and, combined with the other circumstances of this case, entitle it to credit.

I have already stated that Mr. Adams testified most positively, when the draft of the disputed paper was offered in evidence,

27

that it was the identical document from which the will of 1868 had been copied, and it is to be remembered that the interlineations in that draft are almost all made with red ink and that Mr. Adams testified that those interlineations existed when the will was copied from the draft. With a view to testing the truth of this testimony, the contestants submitted the draft to scientific experts, who pronounced the red ink to be a product of eosine, a substance, invented by a German chemist named Caro, in the year 1874, and, after that time, imported to this country.

At first it was sold for $125 a pound, and was so expensive that it could not be used commercially in the manufacture of ink. Afterwards the price was so greatly reduced that it became generally used in making red ink. . It is distinguished by a peculiar bronze cast that is readily detected. It was recognized in the red ink interlineations in the draft of the disputed paper produced by Mr. Adams by a number of scientific gentlemen, among whom were some of the best-known ink manufacturers in the country, and Mr. Carl Pickhardt, who originally imported it.

The effect of this testimony, which was by no means destroyed by opposing witnesses, was to seriously discredit the testimony of Mr. Adams; for if he had interlined the draft, as he claimed to have done, in 1868, he could not possibly have done so with eosine ink.

In this situation of the proofs Mr. Adams was again called to the witness-stand, and then, for the first time, suggested doubt in his mind whether the draft produced was the identical paper from which the document in dispute was copied. He said that before the opening of the case he had expressed some question upon this subject to one of the lawyers interested for the proponents, because the draft was on white paper, but that his doubt was set at rest by the remark that he may have had white paper at command as well as blue. He also recalled that, after his father's death in 1875, Mr. Gordon had asked him for the will of 1868 for the purpose of using it in making a similar document. He recalled that he had informed Mr. Gordon that the will was among his father's papers, and, if it could not be found, that he, the witness, had retained the original draft of it. The witness added:

Gordon's Case.

"I wanted to keep a copy myself; I expected to keep the original draft and I wanted a copy, a *fac-simile* of it; that was a peculiar job, erasing, interlining and everything and I wanted a copy, a *fac-simile* of it, so as to show what sort of a perplexing job we had had to get through with in that whole matter. * * *' I do not like to testify with any uncertainty about it; if it is not the draft of 1868 that was used when the will was drawn, then it is a *fac-simile* of that draft of the will, prepared for Mr. Gordon at some point of time between 1875 and 1877, of which I am not sure."

When the witness was interrogated closely as to his reason for making a *fac-simile* of the draft, he said that it was in accordance with his habit of mind; that the drawing of Mr. Gordon's will was the most difficult task he had ever performed, and that he desired to preserve that which would show how much work the drawing of that will had required. Later, he said that it was possible he might have made a *fac-simile* when he decided to see Sidney Doane and Cuthbert Gordon about the will, but that he does not remember that in fact he did so. He adds that he does not remember of making a *fac-simile* at all; that he has since been burdened with hard labor, thought and incessant work, leaving it to be implied that for that reason his memory is defective. When asked if he remembered that Mr. Gordon had ever applied to him for the draft, his reply was: "He made the request, but whether he made the demand for it or not, I cannot remember." When asked to say pointedly whether the draft produced is an original or a *fac-simile,* he replied:

"It is very probable that this is a *fac-simile* that I made, it is very probable, but I have no distinct recollection in my mind that I did give him that original draft at the time. That has always been my belief that I gave it to him, and I think so now.

"Q. And with that belief you testified that this was the original draft, when you first testified?

. "A. If he called for the original I must have made this a copy and copied it from that and kept it from that time."

Upon further examination, the witness said that he had thought the draft produced to be the original until he saw the will on blue paper, and that then he was perplexed, but dismissed his doubt upon the suggestion of counsel, but afterwards he thought upon the subject "in the vigils of the night," but by unfortunate coin-

cidence did not reach substantial doubt enough to correct his pre-
vious testimony until after the testimony concerning the character
of the red ink he had used in interlining had been produced,
although a short time before that testimony was had he was
called to reiterate his first testimony that the draft produced was
the one from which the will was copied.   When he was asked if
the testimony concerning the red, ink had not created a doubt,
he replied that that testimony was " all bosh," but might have
" waked him up a little."

Two of the counsel for the proponents were sworn to support
Mr. Adams, and, without objection, one of them spoke of Adams.
having stated that he was perplexed by the difference in the color
of the papers upon which the draft and the will were written,
and as to his having afterwards satisfied counsel by stating that
he guessed his perplexity was the " vaporing of his mind."
The other recalled that Mr. Adams had said to him that in 1876,
or 1877 Mr. Gordon had told him, Adams, that he wanted to
make another will.

It is impossible to study this remarkable case at this point alone
without grave doubt as to the truthfulness of Mr. Adams, and,
indeed, as to the frankness with which the case was produced to the
court in behalf of the proponents.   The difference in the color
of the papers had been the subject of discussion in the propo-
nents' conferences, and was left without the explanation which
now, coming for the first time, as it does, to break the force of
the testimony concerning the red ink, is far from satisfactory.
And, as I read the confused answers of Mr. Adams and note his
apparent misapprehension of questions that would tend to involve
him, and note the apparent failure of his theretofore wonderfully
clear and exact memory of the most trivial and unimportant de-
tails, I am inclined to reject his whole story as a fabrication that
has been punctured and fallen to pieces.

There is another attack upon Mr. Adams's credit which de-
serves notice.   Although standing alone, it cannot be said to be
successful, yet, in combination with other circumstances, it has
an appropriate place in the circumstantial proofs to which the
contestants are obliged to resort.   I refer to the proof touching,

his reputation for veracity while he was in the active practice of his profession and his real character was best known. The prominent witness upon this branch of the case is Frothingham Fish, who in 1891, after nine years' service, on account of his advancing age, was retired from the bench of the supreme court of New York. This gentleman was at the bar in Montgomery county during almost the entire term of Mr. Adams's practice there. He appreciated the embarrassment and delicacy of his position as a witness, yet, without hesitation, made oath that Mr. Adams's reputation for truthfulness was formerly bad, to such extent that he would not believe him on oath. He also spoke of an impeachment of that reputation, some years ago, in a court of New York. Many witnesses were produced to break the force of this testimony, and, if numbers are to turn the balance, they outweigh the testimony of Judge Fish. I, however, perceive no sufficient reason for refusing to credit the judge. He appears to be dispassionate and without prejudice, and he certainly had every opportunity to know the reputation of Mr. Adams. I apprehend that a reconciliation of the difference between the witnesses must be, if at all, not by throwing out the testimony of the judge, but by concluding that he knew of a reputation which did not become so general as to reach the gentlemen who differ from him. Many witnesses speak of Mr. Adams's reputation for truth in Orange for the last twelve or thirteen years, but those witnesses testify of a man retired from active life, whom they have had occasion to meet under circumstances which did not try his true character. The effect of the attack upon Mr. Adams's reputation is to leave it in the region of question. It cannot be said that it is beyond question either good or bad.

The contestants, in the next place, undertook to show by comparison that the signatures of George P. Gordon, Henry Adams, Alonzo C. P. Adams and John Q. Adams to the disputed paper are not in the handwriting of the persons they purport to represent.

This comparison was made in two ways—*first*, by witnesses who had acquired personal knowledge of the handwriting of those several persons, by having seen them write, or by having

received writings from them, and who had thus formed in their minds an exemplar of the genuine handwriting, with which they compared the several disputed signatures, and thus reached their opinions; and, *second*, by witnesses who had no previous knowledge of the genuine handwriting, and made their comparison by placing that which was established as genuine in juxtaposition with that which was disputed, and thus formed opinion whether the writings were made by the same person. The latter witnesses were admitted when it was shown that they had special skill and experience in making such comparison.

The theory upon which these expert witnesses are permitted to testify is that handwriting is always in some degree the reflex of the nervous organization of the writer, which, independently of his will and unconsciously, causes him to stamp his individuality in his writing.

I am convinced that this theory is sound. But, at the same time, I realize that in many cases it is unreliable when put to practical test. It must contend not only with disguise, but also with the influence of possible abnormal, mental and physical conditions existing when the writing was made, such, for instance, as the position of the body, whether reclining, sitting or standing; the height and stability of that upon which the writing rests, and the character of its surface; the character of the paper written upon, the ink, the pen and holder of the pen, the health of the writer's body and member with which the writing is made, not only generally, but also with reference to the accidents and influences of the moment.

It follows that unreliability is greater when the disputed writing is short or the standards for comparison are meagre or are all written at one time, and also that uncertainty lessens when the disputed writing is long and the standards are numerous and the products of different dates. Handwriting is an art concerning which correctness of opinion is susceptible of demonstration, and I am fully convinced that the value of the opinion of every handwriting expert as evidence must depend upon the clearness with which the expert demonstrates its correctness. That demonstration will naturally consist in the indication of similar charac-

teristics, or lack of similar characteristics, between the disputed writing and the standards, and the value of the expert's conclusion will largely depend upon the number of those characteristics which appear or are wanting. The appearance or lack of one characteristic may be accounted to coincidence or accident, but, as the number increases, the probability of coincidence or accident will disappear, until conviction will become irresistible. Thus comparison is rated after the fashion of circumstantial evidence, depending for strength upon the number and prominence of the links in the chain. Without such demonstration the opinion of an expert in handwriting is a low order of testimony, for, as the correctness of his opinion is susceptible of ocular demonstration, and it is a matter of common observation, that an expert's conclusion is apt to be influenced by his employer's interest, the absence of demonstration must be attributed either to deficiency in the expert or lack of merit in his conclusion. It follows that the expert who can most clearly point out will be most highly regarded and most successful.

In this case I have looked to the demonstration of the experts and their answers to the insistments of each other, and at the end of my study, which space and time will not admit of incorporation here, I find myself strongly inclined to the belief that the disputed signatures are not genuine. Certainly that which purports to be the signature of George P. Gordon is very unlike his accustomed writing. Perhaps the most striking feature about it is that it lacks the life of the genuine signature. It presents the appearance of a labored and dead production. This is made conspicuous by placing it beside the signature to the will of 1873, which was made to an instrument of the same solemn character as the paper in dispute. For illustration, I here place photographs of those signatures together;

Gordon's Case.

DISPUTED SIGNATURE.

GENUINE SIGNATURE.

Before concluding, I should call attention to a class of evidence much relied upon, the admissibility of which is disputed. I refer to declarations of Mr. Gordon which make for and against the authenticity of the disputed paper as his will. I received this evidence under objection that I might in the determination of the case pass upon its admissibility and use or reject it according to my conclusion.

It is noticed that the question upon which the declarations bear is not as to fraud exercised upon the testator to secure the execution of the will, but as to the fact whether the testator ever executed the instrument. This question was presented in the case of *Boylan* v. *Meeker*, *2 McCart. 310*, first in this court in 1854, where Mr. Justice Potts, of the supreme court, sitting for the ordinary, held that such declarations were admissible, and, several years later, 1860, in the supreme court (*4 Dutch. 274*), where, after exhaustive considerations of the precedents, it was held that such declarations were not admissible either to support or overthrow a will. The latter decision I understand to state the law in this state at this day. The declarations of a testator, when not offered to show his existing mental capacity, are regarded as mere hearsay and are not admissible unless they come within a recognized exception to the rule which excludes that kind of evidence. The exceptions to the rule have been enumer-

ated by Mr. Justice Dixon in *Rusling* v. *Rusling, 9 Stew. Eq.* *603, 608,* where the principle underlying the question considered is discussed in the court of errors and appeals, and *Boylan* v. *Meeker* is cited with approval. So in other cases the same principle is applied. *Lynch* v. *Clements, 9 C. E. Gr. 431; Kitchell* v. *Beach, 8 Stew. Eq. 446; Pemberton's Case, 13 Stew. Eq. 528; Middleditch* v. *Williams, 18 Stew. Eq. 726.*

I am unable to distinguish in principle between the question here presented and that which was considered in *Boylan* v. *Meeker,* and I, therefore, decide against the admissibility of the declarations upon either side.

Taking the case in review as an entirety, I am unable to reach the conclusion that the disputed paper is the will of George P. Gordon. It is not produced from among his effects, but comes, many years after his death, when witnesses have died, and after interests of third persons in the property it gives direction to have become settled, and, as well, under suspicious circumstances and from a suspicious source. The genuineness of the signatures of the testator and the subscribing witnesses is either denied, seriously questioned or doubted by many entirely disinterested witnesses, and when those signatures are submitted to me and compared with unquestioned standards, I am so far in doubt, at least, whether they are genuine, that I cannot accept them. To turn the scale thus poised, my attention has been directed to the testimony of Henry C. Adams, and question has arisen as to the credit that is due to him. He is confessedly the draughtsman of the instrument, the only living person who, for the last twelve years at least, was cognizant of its existence and the virtual producer of it. The paper itself exhibits his interest in its establishment by pledging the entire Gordon estate to the purchase of a farm, in which he and his kindred are concerned, at a price three times its value, preferring that purchase to legacies to the testator's own sisters. Also, the conduct of this witness with regard to the disclosure of this paper is marked by clandestinity. Prior to or pending the bitter contest over the will of 1873, of which he was aware, he did not speak of it, and when that contest was finished and a public official had taken charge

of the estate, he approached only those whose self-interest under his document would be likely to induce them to urge its probate. He failed to communicate either with the presumably impartial and disinterested administrator of the estate, the surrogate at the domicile or other place, or the wife or child of Mr. Gordon. How he approached Sidney Doane and Cuthbert C. Gordon is not known. It is quite certain that he did not send his draft of the will to them, and his letters to Cuthbert C. Gordon and Messrs. Black & King most significantly suggest an air of secrecy and mystery calculated to awaken the suspicion that caused Cuthbert C. Gordon righteously to demand a straightforward declaration of the truth and purpose of Mr. Adams. The letter to Cuthbert bids him " say nothing," but straightway come to Adams, and Messrs. Black & King are admonished that the communication to them is " private and confidential," and that they are to approach him without " brass band, fife or drums." Were Sidney Doane and Cuthbert C. Gordon approached in the same non-committal way ? The demand of young Cuthbert, who acted under the guidance of his father who had already been visited by Adams, indicates that the object of the visit had not been made known to the father; that the father's patience with mystery was exhausted, and that he had determined that his son should force a disclosure of the hidden scheme that annoyed them. After the rebuff suffered in 1879, Adams waited eleven years, witnessing passing events— the second marriage of Mrs. Gordon and the transfer of properties controlled by the will of which he alone had knowledge, into the hands of innocent purchasers for value. Then the wife and daughter and Sidney Doane and the two Cuthberts Gordon died, and the surviving kindred of Mr. Gordon sought to arrest the vesting of his daughter's estate in strangers. Such a situation offered a new opportunity, and while it existed the disputed paper was brought to light. After Adams had interested counsel to the espousal of the paper, he alone took a " survey " of his father's house (when it became possible for him to have put the reddish envelope in the closet), and then told his brother to search the house, not for the purpose of finding the package, al-

though, if we believe him, he thought the paper must be among his father's effects, but ostensibly to be able to prove that no such paper was there. At this instruction, although, if he speaks truly, twenty-two years had passed since he had seen the package, during which his mind had been engrossed in an absorbing work, he described it so accurately that, while it was not endorsed, his brother had no misgivings when he found it, and the moment Adams himself saw it he was so confident of its contents that he declared it and suffered it to be put away unopened. This wonderful memory stands in marked contrast with the uncertain, groping forgetfulness with regard to the originality of the draft of the will and Mr. Gordon's real or pretended application to him for the will itself.

When the disputed paper is read, it betrays so exact a correspondence in terms with the will of 1873, to which Adams could have had access only in 1878 and 1879, that the conclusion is irresistible that one of those wills furnished text for the other, and, to my mind, for the reasons I have given, the evidence is most persuasive that the changes in that text were *from* the will of 1873 and not *to* it. Besides, there stands in it a direction to purchase the Adams farm from "grantees and assigns" and not from "heirs and assigns," fitting a condition of affairs that did not exist until the execution of the Henry Adams trust deed in 1874, and excluding the idea of the transmission of title to heirs, which would naturally have been dominant in the year 1868. After repeated and most positive assurance, under his oath, that, beyond question, the draft which he produced, with its interlineations, was the identical document from which the disputed paper was copied, the red ink episode occurred, and then he exhibited himself in a sea of confusion, admitting former doubt as to that of which he had testified most positively, evasively answering questions which tended to involve him and excusing a most defective memory of events ten years more recent than those of which he had before positively given the most minute details. In this ordeal he avowed a mental inclination and a habit to simulate writings. If he is believed, he made a *fac-simile* of the original draft of the disputed paper eight years after that original

had been made, merely for the purpose of showing himself the mental process he had exercised in the production of the original. Although his time and mind were engrossed in the production of a law book which demanded the labor of a score of years and was of such infinitely greater importance as to demonstrate the insignificance of the work he had bestowed on Mr. Gordon's will, he laid that important work aside and patiently made a *fac-simile* of an intermediate draft for no other purpose than to remind himself of what he had done—and that *fac-simile* did not accomplish his purpose, for it was of a draft that was only intermediate. The first draft he had not retained.

In addition to this the testimony of Judge Frothingham Fish, upon which I have commented, is considered, together with other circumstances of more or less importance to which time has not permitted me to refer.

In face of all these circumstances I find it to be impossible to rely upon the testimony of Henry C. Adams. Excluding it, the will is not proved.

I will deny probate, revoking that which I have heretofore granted in common form.